FILED
United States Court of Appeals
Tenth Circuit

October 27, 2009

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 08-4031

ERIC DUSTIN JOHNSON,

Defendant - Appellant.

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:07-CR-339-DAK-1)**

Bretta Pirie (Steven B. Killpack, Federal Public Defender, with her on brief), Salt Lake City, Utah, for Appellant.

Diana Hagen, Assistant United States Attorney (Brett T. Tolman, United States Attorney, with her on brief), Salt Lake City, Utah, for Appellee.

Before **BRISCOE, EBEL** and **HARTZ**, Circuit Judges.

**EBEL**, Circuit Judge.

This case presents the novel issue of whether an individual can have a

"reasonable expectation of privacy" in a storage unit rented with a stolen identity.

During a search of a storage unit that Defendant-Appellant Eric Johnson's

girlfriend had rented in someone else's name, police discovered two firearms.

Johnson eventually entered a conditional guilty plea to one count of being a felon

in possession of firearms, in violation of 18 U.S.C. § 922(g)(1). He conditioned

his plea on the right to challenge on appeal the district court's decision not to

suppress the evidence that was discovered during the search of the storage unit.

The district court had ruled that the police's warrantless search of the storage unit

did not violate Johnson's Fourth Amendment rights because Johnson had

"forfeited" any privacy rights he might have had in the storage unit by directing

his girlfriend to enter into the rental agreement using another person's name and

stolen identification. We agree. Therefore, exercising jurisdiction under 28

U.S.C. § 1291, we affirm.

## I. BACKGROUND

A. <u>Factual Background</u>

On March 23, 2007, at approximately 1:48 a.m., Sergeant Eric Anderson of

the West Valley Police Department was on patrol in West Valley City, Utah,

when he saw a vehicle driven by Defendant Eric Johnson make a fast turn that

required the vehicle to turn into the wrong lane. Sergeant Anderson ran the

vehicle's license plate, which revealed that it was registered to Johnson and that

Johnson had two outstanding felony warrants. After pulling Johnson's vehicle

over, Sergeant Anderson identified Johnson as the driver and Brittany

Christensen, Johnson's girlfriend, as the front-seat passenger. There were also

2

two individuals in the back seat of the vehicle, and the vehicle was cluttered with tools as well as at least two knives. Johnson's girlfriend had an outstanding felony arrest warrant, and Sergeant Anderson called for back-up to carry out the arrests of Johnson and Christensen.

Officer McCarthy arrived and assisted Sergeant Anderson in arresting Johnson and Christensen. During a search incident to arrest, Anderson located drug paraphernalia in the vehicle's console and searched a black purse lying on the floor of the front passenger area.[1] Inside the purse, Anderson found a glass pipe, typically used to smoke methamphetamine. Anderson also found the following in the purse: some identification in the name of Christensen but other identification in the name of Shannon Haroldsen; a Sam's Club card in the name of Shannon Haroldsen, but with Christensen's photograph on it; as well as a rental agreement in Haroldsen's name for a storage unit at Extra Space Storage in West Valley City, Utah, dated the previous day.[2] Christensen waived her Miranda

---

[1] Johnson does not challenge the legality of the officer's search of the purse. See generally Arizona v. Gant, 129 S. Ct. 1710, 1714 (2009) (addressing search incident to an arrest in the context of a traffic stop).

[2] The rental agreement provided that the "Occupant," identified earlier in the agreement as Shannon Haroldsen, "shall have access to the Space" and "shall safeguard any property stored," and that "[i]t is Occupant's sole responsibility as to those persons who are given access to Occupant's Space." (V Vol., Ex. 2 at 1, ¶¶ 1, 3.) The agreement also provided that in certain circumstances the facility or any governmental authority could access the storage unit: "Occupant grants Owner and Owner's Agents or any governmental authority access to the Space: a) upon three (3) days prior written notice, b) upon default . . . by Occupant . . .,

(continued...)

3

rights, and told Sergeant Anderson that she had obtained Haroldsen's identification from someone in the car. Later, she contradicted herself by stating that she found the identification and rental agreement in the parking lot of a Wal-Mart store.

Sergeant Anderson contacted Haroldsen after discovering that she had reported a burglary of her husband's car several weeks earlier. Haroldsen informed Sergeant Anderson that her purse, containing her checkbook, driver's license, credit and debit cards, and a Sam's Club card, were stolen in the burglary, and that her credit cards and checks had since been used at several establishments. After being informed that the police had found her identification and the rental agreement in her name, she stated that she had not rented the unit and agreed to come to the police station in the morning to consent to a search of the storage unit. Sergeant Anderson then contacted Detective William McKnight, the on-call property detective, and informed him concerning the possible fraud case. Detective McKnight subsequently met with Haroldsen and asked her to sign a consent to search form for the storage unit referenced in the rental agreement.

After signing the consent to search form, Haroldsen accompanied Detective McKnight to the storage unit facility. Detective McKnight explained to the manager of the storage facility, Sherry Kinsey, that the police wanted to search a

[2](...continued)
c) in emergency circumstances, or d) as required by law." (Id., ¶ 4.)

storage unit that had been rented in Haroldsen's name but that Haroldsen had not actually rented the unit or agreed to have the unit rented in her name. The manager then provided Detective McKnight with copies of documents concerning the unit's rental, including the rental agreement and a receipt for one month's rent. Attached to the rental agreement, which bore Haroldsen's name and address, was a photocopy of Haroldsen's driver's license. The receipt for the unit indicated that one month's rent for the storage unit had been paid for in cash.

The manager showed Detective McKnight the storage unit, which was secured by a heavy-duty lock. Because the lock could not be cut and Haroldsen had consented to the search, the manager of the facility gave Detective McKnight permission to open the unit by cutting the latch. After entering the storage unit, Detective McKnight discovered a Savage .22 caliber rifle and a Bronco 410 shotgun.

Subsequently, Johnson was interviewed at the Salt Lake County jail. After being advised of his Miranda rights and signing a waiver form, Johnson told Detective Mike Christenson that "the storage unit was his." (II Vol. 31, 32.) Johnson admitted that he had asked Brittany Christensen to rent the storage unit for him and that he knew the unit was not in Christensen's name. Johnson also admitted that he possessed both of the firearms that were found in the storage unit and that he knew they were inside the unit.

B. Procedural Background

On May 23, 2007, Johnson was indicted on one count of being a felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1), and one count of possessing those guns while being an illegal user of or addicted to a controlled substance, in violation of 18 U.S.C. § 922(g)(3). Johnson moved to suppress evidence that was discovered during the search of the storage unit, and the district court held a suppression hearing on September 12, 2007. After the district court denied Johnson's motion to suppress in a Memorandum Decision and Order dated November 2, 2007, Johnson entered a conditional guilty plea to the first count of the indictment and was sentenced to thirty months' imprisonment. On appeal, Johnson renews his Fourth Amendment objections to the search of the storage unit.

## II. DISCUSSION

A. Standard of Review

When reviewing a district court's decision on suppression of evidence, we review the district court's factual findings for clear error, viewing the evidence in the light most favorable to those findings. United States v. Garcia, 459 F.3d 1059, 1062 (10th Cir. 2006). The district court's ultimate legal conclusion of whether a search was reasonable under the Fourth Amendment and other questions of law are reviewed de novo. United States v. Smith, 531 F.3d 1261, 1265 (10th Cir. 2008). Specifically relevant to this case, we review de novo a district court's determination of whether a defendant has standing to challenge a

6

search.  United States v. Eckhart, 569 F.3d 1263, 1274 (10th Cir. 2009).  The burden of proof is on the defendant to demonstrate that he has a reasonable expectation of privacy in the place searched to establish his standing.  United States v. Gordon, 168 F.3d 1222, 1226 (10th Cir. 1999).

B. Analysis

Johnson asserts that the district court erred in determining that he does not have standing to challenge the search of the storage unit because, according to the district court, he had neither a subjective expectation of privacy nor a reasonable expectation of privacy in the unit.  Furthermore, Johnson disputes the government's argument that, if Johnson were to establish standing, an exception to the warrant requirement would exist to justify the search based upon the consent of either Haroldsen or Kinsey, the manager of the storage facility.

1. *The Right to Privacy Under the Fourth Amendment*

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Because Fourth Amendment rights are personal, a defendant "may only claim the benefits of the exclusionary rule if [his] own Fourth Amendment rights have in fact been violated."  United States v. Jarvi, 537 F.3d 1256, 1259 (10th Cir. 2008) (quoting United States v. Salvucci,

7

448 U.S. 83, 85 (1980)).[3]  "This inquiry requires a determination of whether the Fourth Amendment was designed to protect an interest of the defendant that was violated by the . . . search."  United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989) (citing Rakas v. Illinois, 439 U.S. 128, 140 (1978)).  Thus we turn to the classic two-part Fourth Amendment test: (1) "whether the defendant manifested a subjective expectation of privacy in the area searched" and (2) "whether society is prepared to recognize that expectation as objectively reasonable."  United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000) (internal quotation omitted); see also United States v. Valdez Hocker, 333 F.3d 1206, 1208-09 (10th Cir. 2003).  Even assuming that Johnson established that he had a subjective expectation of privacy in the storage unit, we conclude that he did not show that his expectation of

---

[3]The district court and the parties refer to this principle as Fourth Amendment "standing."  As we have previously noted this terminology is technically "a misnomer" because Fourth Amendment standing is not jurisdictional.  Jarvi, 537 F.3d at 1259 n.2; Smith, 531 F.3d at 1266 n.2.  Indeed, "[t]he Supreme Court has repeatedly insisted that we not use the term 'standing' as shorthand for a defendant's capacity to challenge a search."  United States v. Higgins, 282 F.3d 1261, 1270 n.3 (10th Cir. 2002).  Instead, the Supreme Court has counseled that the question of whether a defendant can show a violation of his own Fourth Amendment rights "is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."  Rakas v. Illinois, 439 U.S. 128, 140 (1978); see also Minnesota v. Carter, 525 U.S. 83, 87 (1998) ("The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of 'standing' doctrine, an analysis that this Court expressly rejected 20 years ago in *Rakas*.").  With that said, we note many of our cases have continued to use the "standing" terminology.  See, e.g., United States v. Beckstead, 500 F.3d 1154, 1163 (10th Cir. 2007).  And, regardless of terminology, the district court's and the parties' analysis involves the correct inquiry.

8

privacy was one that society would recognize as objectively reasonable.

2. *No One Approach Can Accurately Distinguish Whether a Defendant Has a Reasonable Expectation of Privacy*

There is no talismanic test to determine whether an expectation of privacy is one that society is prepared to accept as reasonable. See O'Connor v. Ortega, 480 U.S. 709, 715 (1987) (plurality) ("We have no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable."). Instead, as LaFave's definitive treatise notes, the Supreme Court has appeared to utilize four distinct but coexisting approaches to the "reasonable expectation of privacy" test, reflecting "four models of Fourth Amendment protection: a probabilistic model, a private facts model, a positive law model, and a policy model."[4]  1 Wayne R. LaFave, Search and Seizure: A Treatise on the

---

[4]Professor Orin Kerr describes these models as follows:

The probabilistic model considers the likelihood that the subject's information would become known to others or the police.  The lower the likelihood, the more likely it is that a reasonable expectation of privacy exists.  The private facts model asks whether the government's conduct reveals particularly private and personal information deserving of protection.  This approach focuses on the information the government collects rather than how it is collected.  The positive law model considers whether the government conduct interferes with property rights or other legal standards outside the Fourth Amendment. When courts apply the positive law model, an expectation of privacy becomes reasonable when it is backed by positive law such as trespass. The fourth and final model, the policy model, reflects the direct approach.  Courts applying the policy model focus directly on whether the police practice should be regulated by the Fourth Amendment.

(continued...)

9

Fourth Amendment § 2.1(b), at n.82.1 (4th ed. 2004 & Supp. 2008-09) (quoting Orin S. Kerr, Four Models of Fourth Amendment Protection, 60 Stan. L. Rev. 503, 503 (2007)).  Thus, at times the Court has looked to positive law, such as property and contract law, to determine whether a defendant could establish a reasonable expectation of privacy.  See Rakas, 439 U.S. at 143 n.12, 148 ("[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society"; passengers could not establish a reasonable expectation of privacy because they "asserted neither a property nor a possessory interest in the automobile [searched] nor an interest in the property seized"); see also United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir. 2001) ("[W]ithout a possessory or property interest in the vehicle searched, passengers lack standing to challenge vehicle searches.") (internal quotation omitted); Kerr, supra, at 516-19.  Other times the Court has considered whether government conduct interfered with social customs and norms and "the everyday expectations of privacy" that a reasonable person would expect to remain hidden.  See Minnesota v. Olson, 495 U.S. 91, 98 (1990) (overnight social guest had reasonable expectation of privacy in host's home; social customs

---

[4](...continued)

Orin S. Kerr, Four Models of Fourth Amendment Protection, 60 Stan. L. Rev. 503, 506 (2007).

and norms made it reasonable to expect that guest could object to government's presence at the home); see also United States v. Rhiger, 315 F.3d 1283, 1286-87 (10th Cir. 2003) (social guests have legitimate expectation of privacy in the host's home); Kerr, supra, at 508-12.

Ultimately, however, Professor Orin Kerr suggests that the first three models are primarily components to be considered in applying the ultimate fourth test. Kerr, supra, at 506. Indeed, seemingly since the advent of the reasonable expectation of privacy test in Katz[5] scholars have emphasized that the "'ultimate question'" of whether a privacy expectation is reasonable "'is a value judgment.'" 1 LaFave, supra, § 2.1(d), at 443 (quoting Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 403 (1974)). "'It is whether, if the particular form of surveillance practiced by the police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society.'" Id. (quoting Amsterdam, supra, at 403); see also Sherry F. Colb, What Is a Search? Two Conceptual Flaws in Fourth Amendment Doctrine and Some Hints of a Remedy, 55 Stan. L. Rev. 119, 124 (2002) (arguing that the reasonable expectation of privacy test that determines which police activity is outside the scope of the Fourth Amendment forces the courts to engage in a normative inquiry reflecting social norms).

---

[5]Katz v. United States, 389 U.S. 347 (1967).

11

3. *Johnson Did Not Have a Reasonable Expectation of Privacy in a Storage Unit that his Girlfriend Rented with a Stolen Identity*

People generally have a reasonable expectation of privacy in a storage unit, because storage units are secure areas that "command a high degree of privacy." United States v. Salinas-Cano, 959 F.2d 861, 864 (10th Cir. 1992) ("Common experience of life . . . [s]urely teaches all of us that the law's enclosed spaces . . . are frequently the objects of [our] highest privacy expectations." (quotation omitted)). And an individual can have a recognized privacy expectation in a storage space even when he or she is not the lessee of the unit. See, e.g., United States v. Johns, 851 F.2d 1131, 1135-36 (9th Cir. 1988) (owner of objects in storage unit on which he paid part of rent had a reasonable expectation of privacy in the unit, even though his name did not appear on the lease); United States v. Chaves, 169 F.3d 687, 690-91 (11th Cir. 1999) (defendant had standing to challenge search of warehouse he did not rent, where defendant possessed the only key to the warehouse and stored personal and business papers there); 6 LaFave, supra, § 11.3(f), at 221 (citing cases).

However, the record indicates that Johnson's rental of the storage unit at issue here was not orthodox. Specifically, Johnson directed Christensen to enter into the rental agreement using Haroldsen's stolen identity.[6] For several reasons,

_____

[6]The district court found, in denying Johnson's suppression motion, that "[t]he evidence indicates that Defendant directed Christensen to enter into the

(continued...)

12

this fraud convinces us that the reasonableness of any privacy expectations Johnson might have had were undermined by his and Christensen's decision to use Haroldsen's identity fraudulently to obtain the unit.

The fraudulent use of Haroldsen's identity posed significant risks to her: "identity theft exacts a heavy financial and emotional toll from its victims, and it severely burdens our economy." The President's Identity Theft Task Force: Combating Identity Theft, A Strategic Plan, at viii (April 2007), *available at* http:// www.idtheft.gov/reports/StrategicPlan.pdf. Recognizing the harm identity theft can cause, Congress and all fifty states, including Utah, criminalize identity fraud. See, e.g., 18 U.S.C. § 1028 (Supp. 2009); Utah Code Ann. § 76-6-1102(2)(a) (2008).[7] See generally Nat'l Conference of State Legislatures,

---

[6](...continued)
rental agreement using Haroldsen's driver['s] license." (Dist. ct. order at 5.) On appeal, Johnson appears to challenge this finding on the basis of his statement to the probation officer, who prepared the presentence report, "that he was not aware Ms. Christensen had not used her own name to rent the storage unit 'until the federal case arose.'" (Aplt. br. at 5.) Johnson, however, did not testify to this fact at the suppression hearing. Moreover, Johnson admitted after his arrest that he knew Christensen did not use her own name to rent the unit, and he specifically supplemented the record before the district court with the fact that Detective McKnight would testify that during an interview with Ms. Christensen, she stated "she had been asked by the defendant and [another individual] to forge Ms. Haroldson's [sic] signature, so [they] could rent the storage unit." (I Vol., Dkt. #21 at 1.) Therefore, the district court's finding was not clearly erroneous.

[7]Utah's "Identity Fraud Act" provides, in pertinent part, that:

A person is guilty of identity fraud when that person:

(continued...)

13

Identity Theft Statutes & Criminal Penalties, *available at*

http://www.ncsl.org/programs/lis/privacy/idt-statutes.htm (collecting state statutes

as of November 12, 2007).

While some courts have found an expectation of privacy when an individual

uses an alias or a pseudonym, see, e.g., United States v. Villarreal, 963 F.2d 770,

774 (5th Cir. 1992) ("[I]ndividuals may assert a reasonable expectation of privacy

in packages addressed to them under fictitious names."), such a situation is

distinguishable because it is not necessarily illegal to use a pseudonym to receive

---

[7](...continued)
> (i) obtains personal identifying information of another person whether that person is alive or deceased; and
>
> (ii) knowingly or intentionally uses, or attempts to use, that information with fraudulent intent, including to obtain, or attempt to obtain, credit, goods, services, employment, any other thing of value, or medical information.

Utah Code Ann. § 76-6-1102(2)(a) (emphasis added); see also State v. Chukes, 71 P.3d 624, 628 (Utah Ct. App. 2003) ("Identity fraud requires unauthorized use of the identifying personal identifying information with a view of benefitting oneself or misleading another into a course of action. Identity fraud does not require that the defendant in fact obtained something of value." (internal citation and quotation omitted; emphasis added)).

We find unavailing Johnson's assertion that the use of Haroldsen's identity was not criminal because he and Christensen intended to "assume[] all the obligations" of the rental agreement. The use of Haroldsen's identification occurred in Utah, and plain language of the applicable Utah criminal code, quoted above, clearly applies to the use of Haroldsen's name, address, and driver's license in obtaining the storage unit. See Utah Code Ann. § 76-6-1102(1) ("'personal identifying information' may include: (a) name; . . . (c) address; . . .; (e) drivers license number . . . .").

14

mail unless fraud or a stolen identification is involved. Here, however, stolen identification was clearly involved. And because of the potential harm to innocent third parties, there is a fundamental difference between merely using an alias to receive a package and using another's identity.

Indeed, courts have similarly found that a defendant does not have a reasonable expectation of privacy in the contents of property that he had fraudulently purchased using another's financial information. See United States v. Caymen, 404 F.3d 1196, 1200-01 (9th Cir. 2005); United States v. Wai-Keung, 845 F. Supp. 1548, 1563 (S.D. Fla. 1994) ("Society should not recognize an expectation of privacy in a hotel room obtained fraudulently [through use of an unauthorized or counterfeit credit card], and we do not believe that such an expectation is legitimate or reasonable."), aff'd, 115 F.3d 874 (11th Cir. 1997). The Ninth Circuit, for instance, recognizing that "[t]he Fourth Amendment does not protect a defendant from a warrantless search of property that he stole," considered the purchase of property with another's credit card analogous to stealing property, and thus determined that the defendant likewise had no expectation of privacy in the computer he purchased with a stolen credit card. Caymen, 404 F.3d at 1200-01. Likewise, the storage unit at issue here was obtained by fraud, and "[w]hatever expectation of privacy [Mr. Johnson] might assert is not a legitimate expectation that society is prepared to honor." Id. at 1201.

15

Johnson attempts to distinguish <u>Caymen</u> on the ground that there was no evidence that a fraudulent means of payment was used here to rent the storage unit and therefore his privacy expectations in that unit are legitimate. While it may be true that Johnson and Christensen did not use a fraudulent means to pay the initial administrative fee and first month's rent for the storage unit, it is inaccurate to suggest that Haroldsen, the victim of this identity theft, was not at risk of at least a claim for rent being made against her if Johnson did not make the subsequent rental payments or if Johnson damaged the unit.

Johnson further argues that unlike the obtainment of property by fraud, where a defendant would not be able to exclude the seller from the property, the unit was rented under a valid contract because the use of the stolen identity was not material to the vendor. For this reason, too, Johnson contends he had a legitimate property right in the storage unit and a corresponding reasonable expectation of privacy in the unit.[8]

Any interest Johnson, through Christensen, had in the storage unit, however, was certainly not as strong as if Johnson and Christensen had used their own identities to rent the unit. While under Utah law "'a contract induced by fraud [or] false representations . . . , is not void" at its inception, it is,

_____

[8]We note that the government contends that Johnson did not have a legitimate property right in the storage unit because Johnson was not the occupant listed on the rental agreement and because Haroldsen, the occupant listed on the rental agreement, never gave him permission to use the unit.

16

nevertheless "'voidable.'" Continental Ins. Co. v. Kingston, 114 P.3d 1158, 1161 n.6 (Utah Ct. App. 2005) (quoting Frailey v. McGarry, 211 P.2d 840, 845 (Utah 1949) (other quotations omitted)). That is true whether a "party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying." Peterson v. Coca-Cola USA, 48 P.3d 941, 946 (Utah 2002) (quotation omitted; emphasis added). Here, Christensen's misrepresentation made to the storage company that she was Haroldsen was certainly fraudulent.

And, notwithstanding Johnson's argument to the contrary, it was also material to the rental agreement. Utah law recognizes that "[t]he identity of the parties to a contract is, as a general rule, a material part of the contract." Miller v. Celebration Mining Co., 29 P.3d 1231, 1235 (Utah 2001). "This is especially true where," as here, "a contract contemplates an ongoing relationship rather than a single transaction." Id.

Further, the specific rental agreement at issue here required disclosure of the identity of the renter, and the storage unit operator required proof of identity, as evidenced by the photocopy of Christensen/Haroldsen's driver's license attached to the rental agreement. It can be presumed, then, that the owner of this storage unit would not have rented the unit without proof of the renter's identity. The storage unit owner may have required proof of the renter's identity in order to deter illegal conduct involving the unit, to provide accountability if the

17

contents being stored should turn out to be hazardous, or perhaps just to provide an assured method of contact with the renter should that be needed. In this regard, the terms of the contract provided that the storage unit's owner will give the renter various notices to be sent to the renter's last known address. (V Vol., Ex. 2 at 2, ¶¶ 17, 19.) Moreover, accurate identification of the renter might have been material to the storage unit owner in light of the fact that the owner was agreeing to establish an ongoing relationship involving the rental of real property to the renter in exchange for the renter's continued payment of a monthly rental fee. Whatever the exact reason, it is clear from the terms of the rental agreement that the owner of this storage unit deemed the true identity of the renter to be a material condition of the rental of the storage unit.

Thus, under Utah law, the rental agreement into which Christensen, at Johnson's behest, fraudulently entered using Haroldsen's stolen identity was a contract voidable at the storage unit owner's option. At all times, then, Christensen's contractual right to the storage unit was in jeopardy of rescission.

Moreover, because Christensen, at Johnson's direction, used a real person's identification rather than an invented alias, there was greater risk that the real victim would turn up and demand access to premises secured under his or her name. At all times, then, Johnson's privacy interest in this storage unit was also in jeopardy of the real Ms. Haroldsen showing up, identifying herself and demanding access to her storage unit. Although the probability of this happening

18

at random was undoubtedly remote, the probability increases substantially if, as

here, the police become alerted to Johnson's illegal activity and seek to use his

fraudulent passing off his girlfriend as Ms. Haroldsen against him to gain access

to the unit.

Ultimately, what matters is not whether Johnson might have some

legitimate property interest in the storage unit but whether Johnson's interest is

one that the Fourth Amendment is intended to protect.  Arguments such as those

Johnson advances here do not distract us from the fact that a fraud was

perpetrated, and the victim was a third-party, Haroldsen.  We will not be a party

to this fraud by legitimizing Johnson's interest in the storage unit.  Therefore,

whatever subjective privacy expectations Johnson had in the storage unit were not

expectations that "society is prepared to recognize . . . as objectively reasonable,"

Allen, 235 F.3d at 489 (quotation omitted).  Johnson, thus, did not have any

Fourth Amendment rights in the unit and could not expect that the police were

required to obtain a warrant or establish an exception to that requirement in order

to search the unit.[9]  In light of this conclusion, we need not consider the

government's alternative argument that an exception to the warrant requirement

---

[9]By this opinion we do not intend to create a blanket rule that society would not recognize as objectively reasonable any privacy expectation in any property obtained through the use of another's identity.  We recognize that this area of the law is highly fact specific and that courts have distinguished between searches of residential premises, searches of business premises, searches of vehicles, and searches of other places and effects.  See 6 LaFave, supra, § 11.3 at 128-29.

applied to the search.

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Johnson's motion to suppress.