FILED
United States Court of Appeals
Tenth Circuit

May 12, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 10-1033

RONALD RICHARD CREIGHTON,

Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 06-CR-372-WDM-1)**

Terry R. Miller, Davis Graham & Stubbs LLP (Jonathan W. Rauchway with him on the brief), Denver, Colorado, for Defendant-Appellant.

Paul Farley, Assistant United States Attorney (John F. Walsh, United States Attorney, with him on the brief), Denver, Colorado, for Plaintiff-Appellee.

Before **LUCERO**, **BALDOCK,** and **TYMKOVICH**, Circuit Judges.

**BALDOCK,** Circuit Judge.

Defendant Ronald Creighton appeals the district court's denial of his motion to suppress evidence obtained in three separate searches. In an ongoing effort to support their drug habit, Defendant and his cohorts stole large quantities of personal mail from apartment buildings and condominiums in the Denver, Colorado, metro

area. Defendant would use the information obtained to generate false identifications and counterfeit checks on a computer. Defendant and his cohorts would then pass those checks to local businesses. Over the eighteen month course of the scheme, Defendant suffered four involuntary encounters with law enforcement officials, three of which uncovered the evidentiary fruits at issue in this appeal.

A federal grand jury ultimately charged Defendant with criminal misconduct related to theft and fraud in 16 counts of a 22-count indictment. Following a bench trial, the district court found Defendant guilty on 13 counts and sentenced him to 164 months imprisonment. Relevant to this appeal, Defendant was convicted on Counts 1, 18, and 19 of possessing stolen mail in violation of 18 U.S.C. § 1708; on Counts 2 and 20 of possessing counterfeiting implements in violation of 18 U.S.C. § 1028(a)(5); on Count 3 of fraud in connection with identification documents in violation of 18 U.S.C. § 1028(a)(3); and on Count 5 of making, possessing, and uttering counterfeit securities in violation of 18 U.S.C. § 513(a). Counts 1, 2, 3, and 5 are based on evidence arising from Defendant's arrest on March 8, 2005, outside a Motel 6 in Greenwood Village, Colorado. Count 18 is based on evidence arising from Defendant's arrest on June 19, 2005, inside a Homestead Suites hotel room in Glendale, Colorado. Counts 19 and 20 are based on evidence obtained as a result of Defendant's arrest on July 11, 2006, outside a residence located on Granby Way in Aurora, Colorado. We consider Defendant's challenge to each incident in turn, reciting the applicable facts and legal standards only as relevant to our analyses.

2

Exercising jurisdiction under 28 U.S.C. § 1291, we summarily affirm.

## I.

Defendant first challenges the inventory search of his luggage which followed his lawful arrest by officers of the Greenwood Village Police Department (GVPD) outside a Motel 6 on March 8, 2005. Defendant claims the GVPD's inventory search violated the Fourth Amendment's reasonableness requirement because, contrary to the district court's conclusion, the Government failed to produce evidence that the search was sufficiently regulated. We review de novo the district court's conclusion, based upon the undisputed state of the record, that the GVPD's inventory search of Defendant's luggage was sufficiently regulated, and thus consonant with the Fourth Amendment. See United States v. Allen, 43 Fed. Appx. 363, 364 (10th Cir. 2002) (reviewing the reasonableness of an inventory search de novo).

## A.

In Florida v. Wells, 495 U.S. 1 (1990), the Supreme Court upheld the suppression of evidence uncovered during a state trooper's inventory search of a vehicle where the highway patrol "had *no policy whatever* with respect to the opening of closed containers encountered during an inventory search." Id. at 4–5 (emphasis added). The Court held "that absent such a policy, the instant search was not sufficiently regulated to satisfy the Fourth Amendment." Id. at 5. The Court explained that "*standard criteria or established routine*" must regulate the opening of containers located during an inventory search because "an inventory search must

3

not be a ruse for a general rummaging in order to discover incriminating evidence." Id. at 4 (internal citation omitted) (emphasis added). Rather, an inventory search should promote three administrative purposes: "the protection of the owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger." South Dakota v. Opperman, 428 U.S. 364, 369 (1976) (internal citations omitted). To those ends, the Court in Wells, 495 U.S. at 4, set parameters within which law enforcement might establish a legitimate inventory search policy:

> . A police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself. Thus, while policies of opening all containers or of opening no containers are unquestionably permissible, it would be equally permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors. The allowance of the exercise of judgment based on concerns related to the purpose of an inventory search does not violate the Fourth Amendment.

B.

In this case, the record amply supports the district court's conclusion that the GVPD's inventory search of Defendant's luggage was undertaken pursuant to "standard criteria or established routine," and thus "sufficiently regulated" so as to serve the purposes of a legitimate inventory search. See id. at 4–5. Two officers from the GVPD, Tracy Thompson and Mark Dean, first responded to a call regarding possible property damage at the Motel 6. Both officers testified at the evidentiary

4

hearing on Defendant's motion to suppress. At that hearing, the Government introduced into evidence as Exhibits 1 and 2 the GVPD's "Standard Operating Guidelines" for "Found Property" and "Vehicle Impounds." Both sets of guidelines require an itemized inventory of all personal property coming into the GVPD's possession. Record on Appeal (ROA), Addendum of Exhibits, Gov't Exh. 1 & 2.

Officer Thompson explained that following the arrest of Defendant and one of his cohorts, the two suspects' luggage remained in the parking lot where they earlier had placed it after summoning a cab:

> I told Mr. Creighton and Mr. Jastremski, you know, we can't just leave your stuff out here in the parking lot. They had no friends close by. They didn't live close by. The hotel didn't want anything to do with their property because they weren't registered guests at the hotel. . . . [The hotel] didn't want the responsibility or liability of taking custody of all of that property. So I specifically explained to both of the gentleman that I was going to take custody of all of their property, document any valuables, make sure there wasn't any dangerous implements or weapons, and book it into [GVPD] for safekeeping. I even went as far as explaining, I believe that there may be additional evidence in there about, you know, the fraudulent IDs, but I'm merely going to document your belongings so there is no false accusations of theft or being inconsiderate towards their property.

ROA Vol. 4, Pt. 3, at 93. When asked whether such procedure was standard for the GVPD, Officer Thompson responded: "Absolutely sir. . . . [I]t's part of our past practices. . . . [W]e're highly aware of the importance of documenting people's property." Id. at 94. Officer Thompson stated that several officers including himself "booked all of that property that was in that luggage, documenting everything – there was nearly 100 pieces of property that we documented." Id. at 97. When asked

5

"[w]ould it be fair to say . . . that you initially took that property, under your procedure for inventory integrity, and then you cataloged it and went through a list of everything that was there, also according to the criteria for the Greenwood Village police found property," Officer Thompson responded: "Yes, sir." Id. at 97–98; see Wells, 495 U.S. at 4 (policy of opening all containers "unquestionably permissible").

Officer Dean also testified the GVPD's "standard operating procedure [was] for us to make sure we document everything." ROA Vol. 4, Pt. 3, at 115–16. When asked "[w]ould it be fair to say that this procedure that the [GVPD] has, as outlined in Exhibits 1 and 2, is for the protection of the Greenwood Village officers, the [GVPD], and, indeed, the person who would be the lawful owner of that property," Officer Dean stated: "Yes, sir." Id. at 116. We need not belabor the point. In view of the preceding discussion, Defendant's claim that the GVPD's inventory search of his luggage following his arrest outside the Motel 6 on March 8, 2005, was not sufficiently regulated to promote the three aforementioned administrative purposes, but rather was merely "a ruse for a general rummaging," is meritless.[1]

---

[1] The Government alternatively suggests that the evidence upon which Defendant's convictions under Counts 1, 2, 3, and 5 rest did not arise from the inventory search. Rather, according to the Government, the evidentiary support for Count 1 was located in a locked blue sentry safe for which a search warrant was obtained after its lock inadvertently broke and contents accidentally spilled. See ROA, Addendum of Exhibits, Gov't Exh. 5, at 7. The evidentiary support for Count 2 was found in a laptop computer also searched pursuant to a warrant. See id. Gov't Exh. 4. The evidentiary support for Counts 3 and 5, meanwhile, was found not only in the safe and computer, but also on Defendant's person during a search incident to his arrest. Because Defendant's argument that the GVPD's inventory search of his
(continued...)

6

II.

Defendant next contests the Glendale Police Department's (GPD) warrantless entry, on June 19, 2005, into a Homewood Suites hotel room where he had been residing with the room's registered occupant for the better part of a week. The district court ruled Defendant lacked "standing" to challenge police officers' entry into the room, wherein they observed incriminating evidence in plain view, in turn justifying Defendant's arrest and a more extensive search. The court found that prior to the entry, Defendant knew that management (1) had claimed the rent was overdue and (2) had told the registered occupant to pay or vacate the premises. Based on these findings, the court concluded Defendant had foregone any expectation of privacy in the room that society would accept as reasonable. We review the district court's findings for clear error and its conclusion, based on those findings, de novo. See United States v. Johnson, 584 F.3d 995, 998 (10th Cir. 2009) (reviewing a defendant's standing to challenge a search).[2] The Defendant has the burden of establishing his standing, or, in other words, a subjective expectation of privacy in

[1](...continued)
luggage violated the Fourth Amendment fails, however, we need not delve into possible alternative grounds for affirming the district court's ruling.

[2] As we explained in Johnson, 584 F.3d at 999 n.3, reference to "standing" in a Fourth Amendment context is a misnomer because such standing is not jurisdictional. Rather, "the question of whether a defendant can show a violation of his own Fourth Amendment rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." Id. (internal quotations omitted).

7

the hotel room that society is prepared to recognize as reasonable. See United States

v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009).

A.

We assume for the sake of argument that an individual like Defendant who,

unbeknownst to management, shares a hotel space with a room's registered occupant

to engage in criminal activity has an expectation of privacy in the room at least

commensurate with the registered occupant's. But see United States v. Cooper,

203 F.3d 1279, 1285 n.3 (11th Cir. 2000) (suggesting an unregistered overnight

guest using a hotel room "predominately to engage in narcotics trafficking" lacked

standing to challenge a warrantless search of the room). Such expectation of privacy

generally ends, however, upon expiration of the rental period.[3] In United States v.

Varnedore, 73 Fed. Appx. 356, 360 (10th Cir. 2003), we stated:

> Although a motel guest does have a legitimate expectation of privacy
> in his room, United States v. Gordon, 168 F.3d 1222, 1225–26 (10th
> Cir. 1999), that expectation of privacy is lost when the rental period for
> the room expires. United States v. Croft, 429 F.2d 884, 887 (10th Cir.
> 1970); . . . . "Since after the rental period expires a guest has no right
> of privacy, there can be no invasion thereof." Croft, 429 F.2d at 887.

---

[3] We do not discount the possibility that a hotel guest may continue to have a legitimate expectation of privacy in a room after the expiration of the rental period expires *if* the facts establish a pattern or practice that would make such expectation reasonable. See United States v. Owens, 782 F.2d 146, 149–150 (10th Cir. 1986) (registered occupant did not lose his expectation of privacy in a hotel room by staying past the check-out time where he had previously done so without incident). But no such pattern or practice appears to have justified Defendant's continuing occupancy of the Homewood Suites hotel room at the time of the GPD's entry on June 19, 2005.

8

B.

Following an evidentiary hearing, the district court made findings which have ample support in the record:

> The evidence is that the parties had not paid the amount due. The defendant's exhibit does confirm that $181 and some odd cents was unpaid [as of June 19, 2005]. The [responding] officer testified that the operator of the Homestead Suites had called [the room] to complain and given a deadline, and that the deadline had arrived, and she wanted assistance [in collecting the rent]. And the defendant's testimony indicated that he was aware that there was a dispute, at least that some amount was claimed to be due. And I find that the evidence presented indicates that the person who had rented the room lost their right of privacy, and the defendant's right was derivative. . . .[I]t's certainly reasonable for a guest of a tenant in a hotel to expect some privacy. But this defendant had knowledge of the disputes. And I conclude that the subjective intent to retain a privacy interest in these circumstances would not be one that society is prepared to recognize . . . .

ROA Vol 4, Pt. 3, at 48. At the evidentiary hearing, Defendant, despite his testimony that he did not know the rent was overdue, brought to the attention of the court and counsel a hotel invoice, entered of record, showing the amount due on the room as of the morning of June 19, 2005, was $181.59. Id. at 20–21; see ROA, Addendum of Exhibits, Gov't Exh. 17.

Further belying Defendant's claim to ignorance is the trial testimony of Tamara Wattenberg, the hotel manager.[4] Wattenberg testified she made numerous

---

[4] In reviewing the denial of a motion to suppress, "[w]e are permitted to consider the evidence introduced at the suppression hearing, as well as any evidence properly presented at trial, and we view all of the evidence in a light most favorable to the ruling of the district court." United States v. Harris, 313 F.3d 1228, 1233

(continued...)

9

phone calls to the room to inquire about the rent due. But instead of speaking with Myra Burton, the room's registered occupant, she "spoke to several different people." ROA Vol 4, Pt. 6, at 450. "It was the amount of people I had spoke to over the phone that concerned me without speaking to Myra consistently." Id. at 452. Wattenberg made "a minimum of three calls" to the room on June 18 to advise its occupants that the rent was overdue. Id. "My concern started to mount . . . when they said they would bring in money the following morning for that night and the following night. And every time I talked to them it was always I promise to pay, but it was never paid." Id. at 450. The next morning, Wattenberg made two more calls to the room before calling the GPD to assist her in collecting the rent. When collection efforts proved unsuccessful, police officers began evicting the room's occupants around 10:00 a.m.

Myra Burton's trial testimony similarly cast serious doubt on Defendant's purported lack of knowledge about the situation. Burton stated that she, Defendant, and two other men had arrived at the hotel around June 12. Inside the room, Defendant "was using a laptop to make checks and using the scanner to scan IDs and print fake identification." Id. at 578. Burton testified that on June 18 management had warned her and the three men to pay the rent or leave the room: "They told *us* the night before, the night before the police showed up that *we* had to pay them by

---

⁴(...continued)
(10th Cir. 2002).

10

7:30 in the morning, . . . and if *we* failed to do that, *we* would have to vacate the premises and *we* would be evicted."[5] Id. (emphasis added).

The district court properly declined to credit Defendant's claim that he never received reasonable notice of the impending eviction. The evidence reasonably suggests that Defendant could *not* have remained unaware of the situation after spending nearly a week in the same room engaging in a criminal enterprise with Burton. Like the district court, we have no difficulty concluding, based on the state of the record, that society would not extend recognition of Defendant's expectation of privacy in the Homewood Suites hotel room beyond that of Burton's. Burton's reasonable expectation of privacy in the room ended no later than 10:00 a.m. on June 19, 2005. And so did Defendant's.

## III.

Lastly, Defendant contests, for alleged want of exigency, the Aurora Police Department's (APD) warrantless seizure of his person on July 11, 2006, from a residence on Granby Way. The district court held that because Defendant possessed a firearm in a possibly volatile situation, exigent circumstances justified police officers' threat to send a police dog into the home unless Defendant promptly exited.

---

[5] On cross examination, Burton acknowledged that she had been under the influence of methamphetamine and the deadline for payment "may have been later" than 7:30 a.m. ROA Vol. 4, Pt. 7, at 604. The first responding officer, Michelle Folmar, testified that Wattenberg told her the deadline for payment was 10:00 a.m. ROA Vol. 4, Pt. 3, at 28.

11

Subsequent to his timely exit, Defendant confessed to wrongdoing and consented to a search that in turn provided further evidence of criminal misconduct. The existence of exigent circumstances is a mixed question of law and fact which the Government bears the burden of establishing. See United States v. Reeves, 524 F.3d 1161, 1169 (10th Cir. 2008). We review the district court's factual findings for clear error and the ultimate question regarding the reasonableness of a warrantless seizure from a residence de novo. See United States v. Najar, 451 F.3d 710, 717 (10th Cir. 2006) (reviewing a warrantless entry based on exigent circumstances).

## A.

In reviewing application of the exigent circumstances exception to the Fourth Amendment's warrant requirement, "we evaluate the circumstances as they would have appeared to prudent, cautious, and trained officers." Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d 1065, 1071 (10th Cir. 2010). We assess the propriety of Defendant's seizure "based upon what the officers reasonably believed at that time. It does not matter that, in retrospect, information provided to the officers was wrong." Id. at 1072. Defendant's seizure was reasonable under the Fourth Amendment, regardless of the individual officers' subjective motivations, as long as the circumstances *at the time of the seizure*, "viewed objectively," justified the seizure. Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006) (emphasis and internal quotations omitted). Among the factors that may give rise to exigent circumstances justifying a warrantless seizure from a residence are the immediate

12

need (1) to secure the personal safety of all in harm's way, including the suspect, (2) to impede the possibility of escape, and/or (3) to prevent destruction of evidence. See Minnesota v. Olson, 495 U.S. 91, 100 (1990).

## B.

Certain aspects of the lawfulness of the Granby Way search and seizure were before us previously in United States v. Creighton, 277 Fed. Appx. 796 (10th Cir. 2008). There, we addressed the Government's appeal from the district court's partial grant of Defendant's initial motion to suppress. In that motion, Defendant suggested the APD lacked any basis, including exigent circumstances, to detain him. See ROA Vol. 1, Pt. 1, at 91–92, 95–96. The district court apparently ruled that exigent circumstances justified the APD's threat to send in a trained police dog if Defendant did not promptly exit the residence. See ROA Vol. 4, Pt. 8, at 993–97. The court, however, granted Defendant's motion with respect to the Granby Way residence, "concluding the 'initial detention Terry stop' was proper, but that Defendant's arrest and continued detention were not supported by probable cause and, thus, were in violation of the Fourth Amendment." Creighton, 277 Fed. Appx. at 799. The Government appealed. At the outset of our analysis we observed:

> Although the use of the Terry paradigm is debatable, Creighton has not challenged the district court's conclusion that his removal from the residence and initial detention were appropriate. Instead, like the Government, Creighton confines his arguments to the issue of whether the officers had probable cause to arrest and detain him once the initial Terry investigation ended.

13

Id.. We held Defendant's arrest and detention were valid, and reversed the district court's suppression of the evidence.

Having lost on appeal, Defendant unsuccessfully sought to recoup that loss in the district court by renewing his motion to suppress with respect to the "district court's conclusion that his removal from the residence and initial detention were appropriate." Id. The impetus for Defendant's renewed motion, and his present appeal from its subsequent denial, plainly was our observation that "[i]n light of [Detective] Giger's testimony that officers threatened to send a police dog into the Aurora residence if Creighton did not exit, it would appear that Creighton's seizure should be analyzed under Payton v. New York, 445 U.S. 573 (1980)." Creighton, 277 Fed. Appx. at 799 n.3. In Payton, the Supreme Court struck down a New York statute that authorized law enforcement to enter a private residence without a warrant, and, if necessary, with force, to make a routine felony arrest. The Court commented: "Although it is arguable that the warrantless entry to effect Payton's arrest might have been justified by exigent circumstances, none of the New York courts relied on any such justification." Payton, 445 U.S. at 583.

We now belatedly proceed to analyze Defendant's warrantless seizure from the Granby Way residence under the exigent circumstances exception to the Fourth Amendment's warrant requirement.[6] Apart from the fact that Defendant possessed

---

[6] We wonder whether Defendant, having failed to challenge the district court's adverse ruling regarding exigent circumstances as part of the Government's earlier
(continued...)

14

a firearm, the district court on remand did not make particularized findings as to what the responding officers knew at the time of Defendant's warrantless seizure.[7] Nonetheless, because the record is sufficiently developed, we may uphold the court's

[6](...continued)

appeal, should be permitted to raise it as part of his own appeal. In Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc., 573 F.3d 947, 963 (10th Cir. 2009), we reiterated a long-standing legal principle in this Circuit: "A legal decision made at one stage of litigation, unchallenged in a subsequent appeal *when the opportunity to do so existed*, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time." (internal quotations omitted) (emphasis added); see also United States v. Henry, 472 F.3d 910, 913–14 (D.C. Cir. 2007) (applying an identical principle in a criminal context); United States v. Kress, 58 F.3d 370, 373–74 (8th Cir. 1995) (same). In his opening brief, Defendant acknowledges that "he did not raise the exigency issue on interlocutory appeal," but "the lack of clarity in the district court's ruling on exigency likely would have prevented [him] from prevailing on this issue on interlocutory appeal." Appellant's Opening Brief at 15. But that is not for Defendant to decide. Had Defendant thought when opposing the Government's appeal that the district court's ruling on his initial seizure might be determinative, he should have said so. But he did not, and now we have two appeals on the lawfulness of the Granby Way search and seizure instead of one. What is certain is that nothing prevented Defendant from raising his objection to his initial seizure based upon a lack of exigent circumstances as an alternative ground for affirming the district court's original suppression order. See Haynes Trane Serv. Agency, Inc., 573 F.3d at 963 (observing that "the rule has properly been applied to appellees in some cases"). The district court heard evidence the first time around on Defendant's claim that the APD unlawfully forced him from the residence with a police dog. Creighton, 277 Fed. Appx. at 799 n.3. The district court rejected that claim and Defendant did not challenge that ruling on appeal. Id. at 799. Still, having said all that, the Government does not press the point; so we press our query no further. See generally Concrete Works of Colo., Inc. v. City & Cnty. of Denver, 321 F.3d 950, 992–93 (10th Cir. 2003) (discussing the rule and its exceptions). Instead, we dispose of Defendant's third claim, like his first two claims, on the merits.

[7] The transcript of the district court's original 2007 ruling, which may contain such findings, is not part of the present record on appeal and is unavailable to us electronically. On remand, the court explained: "[I]n the transcript from my order that was . . . filed August 7, 2007 and it is Document 143, I specifically made the [exigent circumstances] analysis . . . ." ROA Vol. 4, Pt. 8, at 994–95.

15

ruling "if there is any reasonable view of the evidence to support it." United States v. King, 222 F.3d 1280, 1283 (10th Cir. 2000) (internal quotations omitted).

C.

Our recitation of the facts in our prior opinion as they bear upon the question of Defendant's warrantless seizure is consistent with the record evidence as we again recite it, this time in more detail. See Creighton, 277 Fed. Appx. at 797–98. While away from the Granby Way residence, Melissa Bowery, another of Defendant's cohorts, became concerned that she might be arrested for criminal impersonation. According to the testimony of APD Detective Kenneth Giger offered at the motion hearing, Melissa told police that Defendant had been holding her against her will in her mother Linda Bowery's Granby Way home for the past two days. Melissa stated Defendant had forced her to make and pass fraudulent checks to satisfy a drug debt her husband owed to Defendant:

> The information we had from Ms. Bowery was that part of what Creighton had going on, he had a gun either with him or on him or near him at all times. He had shown the gun to Melissa. He had never pointed it at Melissa Bowery, but had threatened to harm her husband. And on the 11th, Melissa Bowery left to go to a custody hearing. At that time she was told, if you're not back in three hours, your mother will be hurt.

ROA Vol. 3, at 18–19.

At trial, APD Officer Arturo Zepeda, who arrived on the scene prior to Detective Giger, substantially confirmed the latter's hearing testimony. Officer

16

Zepeda stated Melissa told officers she had lied to Defendant about the custody hearing in order to escape from the home. Melissa further indicated "the threat [of harm] came directly from Mr. Creighton to her, not to her mother:"

> [I]nferences were made that if she obviously didn't come back within the three hours that was allotted for the time to go to the custody hearing, something would happen, but again no direct threats. And at that point I believe [Linda] was never made aware of what was completely going on . . . .

ROA Vol. 4, Pt. 7, at 1157.

After securing the perimeter of the residence, APD officers instructed Melissa to phone her mother and tell her to come outside. Once outside the home, Linda Bowery told police "she had no clue why [they] were there" and "there was no hostage situation." Id. at 1166. But Melissa did not recant at that point. Melissa testified "no" when asked at trial if she "correct[ed] the officers before they went into the home that what [she] had told them about the hostage situation was not true." Id. at 1276. Rather, *at that time*, police understood, based on Melissa's version of events, that Defendant had made his threats known only to her and not to her mother. When Officer Zepeda was asked at trial whether "it was clear from your conversation with Melissa Bowery that the threat was made to Melissa Bowery, not to the mother Linda Bowery," he responded: "Correct, it was clear." Id. at 1170. Therefore, Linda's ignorance of the situation as Melissa reported it to the police was explainable, giving rise to a possible scenario the APD could not ignore.

17

Cognizant of these circumstances, APD officers decided to remove Defendant from the home promptly by alerting him via bull horn as to the presence of the police dog. Officer Zepeda testified to three concerns regarding Defendant remaining in the home while the investigation proceeded, namely that Defendant reportedly (1) had held Melissa against her will, (2) remained armed, and (3) was engaged in forgery and fraud. See id. at 1160. Detective Giger testified as to the APD's responsibility under the circumstances:

> When the officers first got down there, they believed they still had a hostage situation going on with an armed party inside the house, one party outside. That is why they had the dog come down to get Ms. Linda Bowery out, for her safety and well-being. They then brought Mr. Creighton out with his hands up for his safety, for the safety and well-being of the officers and placed him in custody. At that point in time we started our investigation as to whether we have a kidnaping, extortion, blackmail type situation, a threat situation, and how heavily involved the check making and ID and fraud situation adds on top of that. So our initial obligation when we got there was to protect both Linda Bowery and to try and maintain the safety of Mr. Creighton as much as we could.

ROA Vol. 3, at 37–38. When asked if the APD "would have been totally irresponsible to have ignored" Melissa's account, Detective Giger responded: "It would have been a horrendous thing to do if we had ignored that and things had gone bad." Id. at 36–38.

Of course, once Defendant began to speak with Detective Giger outside the home, Melissa's version of events began to unravel. That her "story and her allegations of false imprisonment and extortion were 'quickly falling apart'" became

18

readily apparent. <u>Creighton</u>, 277 Fed. Appx. at 798. But such after the fact assessment of the situation is immaterial to our inquiry because in assessing the presence of exigent circumstances "[i]t does not matter that, in retrospect, information provided to the officers was wrong." <u>Armijo Sanchez</u>, 601 F.3d at 1072. What is material is how, viewing the circumstances objectively, a prudent, cautious, and trained police officer would have responded to the situation. <u>See</u> <u>id.</u> The foregoing evidence simply does not support Defendant's claim that his warrantless seizure was based *solely* on a "report of a mere presence of a weapon in the context of suspected counterfeiting activity." Appellant's Opening Brief at 19. Suffice to say Defendant's seizure was reasonable under the Fourth Amendment because the circumstances as they objectively appeared at the time of Defendant's seizure justified the APD acting without a warrant. <u>See</u> <u>Brigham City</u>, 547 U.S. at 404. In brief, APD officers acted prudently, cautiously, and reasonably in securing the entire crime scene and gaining safe access to all individuals involved before investigating the situation further and sorting out the truth.

AFFIRMED.

United States v. Creighton, 10-1033

**LUCERO**, J., concurring.

I concur in the majority's holding, but write separately to address an important point of disagreement. The majority speculates in footnote six that we could decline to address Creighton's claim because he failed to make this argument during the earlier interlocutory appeal. But this circuit has never come close to holding what the majority suggests—that unless a criminal defendant advances alternative bases for affirming a suppression ruling during the government's interlocutory appeal, he cannot make those arguments in his own direct appeal.

The majority cites Haynes Trane Service Agency v. American Standard, Inc., 573 F.3d 947 (10th Cir. 2009), for the idea that "[a] legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time." Id. at 963 (quotation omitted). But this is a principle of civil litigation, and has no place in the context of an interlocutory appeal in a criminal prosecution. Criminal procedure is different: 18 U.S.C. § 3731 permits the government to take an interlocutory appeal, but does not authorize a defendant to simultaneously cross-appeal. It is inappropriate to mechanistically import a rule from civil procedure, where cross-appeals are permitted, to criminal procedure, where they are not.

Procedurally, this case is nothing like the cases the majority cites for its novel law-of-the-case principle. Both United States v. Henry, 472 F.3d 910 (D.C. Cir. 2007), and

<u>United States v. Kress</u>, 58 F.3d 370 (8th Cir. 1995), held that a criminal defendant who could have advanced an argument in <u>his</u> first appeal could not advance it for the first time in <u>his</u> second appeal. Neither case addressed, or even contemplated, arguments not raised during the <u>government's</u> interlocutory appeal. And, although the Eighth Circuit recognized that a criminal defendant <u>may</u> advance alternative bases for affirming suppression during an interlocutory appeal, <u>see</u> <u>United States v. Valle Cruz</u>, 452 F.3d 698, 705 (8th Cir. 2006), the majority cites no authority for the proposition that a defendant <u>must</u> advance alternative bases during the interlocutory appeal.

I am not surprised by the lack of authority supporting the majority's proposal, because the rule, if ever accepted by any circuit, would cause great mischief. Unsure of which arguments to make on interlocutory appeal, a cautious defendant would simply advance every possible claim in order to preserve it for appeal. For this reason, even in the civil context in which the rule rightly applies, it is "prudential, not jurisdictional" and "appellate courts should not enforce the rule punitively against appellees, because that would motivate appellees to raise every possible alternative ground and to file every conceivable protective cross-appeal, thereby needlessly increasing the scope and complexity of initial appeals." <u>Kessler v. Nat'l Enter., Inc.</u>, 203 F.3d 1058, 1059 (8th Cir. 2000).

This case illustrates the problem. The district court's oral ruling on exigency is extremely cursory and lacks any detailed finding of fact or legal analysis. Given that we will affirm on an alternative basis only if the record is indisputable and clear, <u>see</u> <u>United States v. Schneider</u>, 594 F.3d 1219, 1227 (10th Cir. 2010), the forfeiture rule suggested

by the majority would require Creighton to make a facially frivolous argument, just for the sake of preservation.

Because the forfeiture rule proposed in footnote six would hamper the goal of judicial economy, and place a fundamentally unfair burden on an appellee who is not allowed to cross-appeal, our circuit has wisely opted not to adopt such a rule. We should not change course.