*836 DAVIS, Circuit Judge,
dissenting:
We are all familiar with the old legal saw:
When the facts are against you, hammer the law. When the law is against you, hammer the facts. When both are against you, hammer the table and yell like hell.
In re Fischer, 131 B.R. 137, 138 (E.D.Mo.1990).
The facts and the law cannot be ignored in this appeal. Nor can the pounding they take from the majority denude them of the power they possess.
The record before the district court established, by a preponderance of the evidence, that ‘Wilmer Castenada”[1] was the alias of Appellant, who had a possessory interest in, and an undisputed right to exercise dominion and control over, the Ford Explorer. Thus, contrary to the holding reached by the majority’s abbreviated analysis, the proper result on the record before us is that the district court erred, procedurally and substantively, factually and legally, in reaching its- conclusion that Appellant failed to establish an objectively reasonable, i.e., a “legitimate,” expectation of privacy[2] sufficient to maintain his Fourth Amendment challenge to the warrantless, nonconsensual search of the vehicle.
First, the district court never called on Appellant before or during the evidentiary hearing on the motion to suppress to “prove” his standing to challenge the search of the Explorer. See infra n. 16. It did not do so, most likely, because the facts known to the government and the facts before the district court, prior to the suppression hearing, ■ demonstrated that Appellant had an objectively reasonable expectation of privacy in the vehicle. Rather,than call on Appellant at the outset to offer evidence of his. standing (evidence that was already in the record), the district court proceeded directly to the merits of the suppression hearing by requiring the government to put on evidence. See id.
Second, like the district court, the government never called on Appellant to “prove” his standing to challenge the search of the Explorer. It did not do so because the prosecuting Assistant United States Attorney knew full well that Appellant, as a member of the narcotics conspiracy charged with seeing to the delivery from California to North Carolina of the cocaine hidden in the gas tank of the Explorer, had. standing to challenge the search of the vehicle. Indeed, the record raises a serious question as to whether the prosecutor affirmatively misled the district court, through her selective presentation and advocacy of certain evidentiary facts, into making its erroneous determination of the legitimacy of Appellant’s expectation of privacy. See infra n. 6.
Third, as a matter of law, the government and the district court misapprehended the nature and the character of the evidence necessary for Appellant to establish his standing to challenge the search of the. Ford Explorer. As an initial matter, the court and the government erroneously believed that standing could only be established by evidence formally introduced by Appellant. That is not and has never been *837 the law. See infra Part III.A. Furthermore, by obsessively and narrowly focusing on the state of mind of the law enforcement officer who conducted the challenged search, the government and the district court erroneously failed to apply the appropriate Fourth Amendment test for standing, a test that hinges on objective reality at the time of the search, not on a law enforcement officer’s subjective belief about the state of facts surrounding search and seizure issues. See infra Part III.B. Viewed as it must be, in this and any case, from an objective perspective as of the time of the search, the issue of standing is easily and correctly resolved in favor of Appellant.
Fourth and finally, the district court’s finding and conclusion that Appellant’s use of a common carrier to ship narcotics hidden in a constitutionally protected effect, i.e., the gas tank of an automobile, coupled with the use of an alias, delegitimizes his expectation of privacy, constitutes clear factual error and manifest legal error. See infra Parts III.C & D. The evidence in this record shows that the district court committed clear error in finding that “[t]he shipper’s address was false” (whatever that means) and that “[t]he person who was to receive [the Ford Explorer] was a false address [sic].” J.A. 72; see infra Part III.E. Indeed, directly contrary to the district court’s finding, the government effectively proved that its sole suppression hearing witness had erroneously concluded that the intended destination of the Ford Explorer was an address other than that identified on the bill of lading.
At bottom, as a matter of law, Appellant did not relinquish, and society is not prepared to extinguish, the objective reasonableness of his undisputed subjective expectation of privacy simply because he used an alias to conceal his involvement in a narcotics trafficking conspiracy.[3]
Respectfully, and for all of the reasons set forth herein, I dissent.
I.
A.
The majority opinion erroneously regards the relevant narrative of this case to commence on September 20, 2010, when Captain Kevin Roberts, of the Reeves County, Texas, Sheriffs Department, happened upon $3 million in cocaine hidden in the gas tank of a Ford Explorer he searched without a warrant and without valid consent. Rather, as the government advised the district court in its written opposition to the motion to suppress, the story begins sometime in 2009. As the government explained to the district court:
During in or about 2009, the Greensboro Resident Office of the Drug Enforce *838 ment Administration (GRO-DEA) initiated an investigation into the suspected drug trafficking activity of Juan Manuel Lopez. The investigation continued into 2010, and in August 2010, DEA agents obtained court authorization to install a global positioning satellite (GPS) tracking device on a burgundy Chevrolet Sil-verado pickup truck utilized by Juan Manuel Lopez.
J.A. at 21-22 (footnote omitted).[4] Thus, the government had been investigating the Greensboro narcotics trafficking operation of which Appellant was a part for more than a year prior to the serendipitous intervention of Captain Roberts in Texas on September 20, 2010. Indeed, as set forth above, for approximately a month prior to the events in Texas, the United States had been able to surveil one of the Greensboro, North Carolina, participants in the conspiracy through the use of GPS tracking technology. Through the use of that technology and other undisclosed investigative activity, the lead investigator, Agent Ra-zik, came to anticipate the arrival of the Ford Explorer in Greensboro, and learned that Appellant, Arturo Castellanos, was using the alias “Wilmer Castenada” in his management, on behalf of the conspiracy, of the shipping and delivery of the Ford Explorér from California to North Carolina. J.A. 22-24, 45-48. In short, by the time of Captain Roberts’s search of the Ford Explorer, the United States had at least one of the participants in the drug conspiracy charged in this case, of which Appellant was a part, well in its sights.
*839 The government’s proffer of evidence to the district court in its opposition to the motion to suppress continued as follows:
On September 26, 2010, agents monitoring the GPS tracker followed Lopez’s vehicle first to the intersection of Mont-lieu Avenue and Market Street in Greensboro, North Carolina. Approximately 40 minutes later, he traveled to a restaurant near High Point Road and Meritt Drive in Greensboro. Surveillance agents saw Lopez leave the restaurant with two other men, later identified as Auturo [5] CASTELLANOS and Raul Hernandez. The three traveled together in Lopez’s vehicle to Four Seasons Mall in Greensboro. Surveillance footage from the Mall was obtained by DEA agents.

Because he was familiar with a business located in the Montlieu Avenue and Market Street area of Greensboro that receives shipped vehicles from DAS Auto Shippers, Special Agent Razik contacted the business and asked if anyone had been in on that day inquiring about a vehicle. The agent was advised that a Hispanic man had just been in making inquiry about a Ford Explorer. Agent Razik was advised that the same man had been in several times since September 24, 2010, asking about the vehicle. The man left telephone number 336-263-7145 as a contact number.

On September 27, 2010, the Montlieu Avenue business notified Agent Razik that the same Hispanic man had called again about the Ford Explorer and the man identified himself as “Wilmer.” The man stated he was going to contact DAS directly. DAS Auto notified DEA later on September 27, 2010, that the Ford Explorer was seized in Texas on September 20, 2010.

On September 29, 2010, an employee at the Montlieu Avenue business notified Agent Razik that the Hispanic man had again come to the business inquiring .about the Ford Explorer. The employee advised that the man had presented a tracking number and a copy of the title for the Explorer. ■ Agent Razik went to the business and obtained a copy of the vehicle’s title. He also showed the two employees who spoke with the Hispanic man a photograph that was taken from the video footage at Four Seasons Mall on September 26, .2010. Both employees identified defendant Auturo CASTEL-LANOS as the man who had been to the business between September 24 and September 29, 2010, inquiring about the Ford Explorer.
J.A. at 22-24 (emphases added).
Thus, at the time of the suppression hearing in this case, on July 6, 2011, the government knew full well that Appellant had appeared in Greensboro, North Carolina, at the actual Montlieu Avenue address where the Ford Explorer was to be received by Appellant, who at all times was using his alias, “Wilmer,” and who was using a phone assigned the 336-263-7145 number. In short, the government knew at the time of the hearing on the motion to suppress that Appellant was “Wilmer Castenada.” The government also knew that during the period between September 24 and 27, 201Ó, Appellant was in Greensboro, North Carolina, not in California. And, the government knew that Appellant was a member of a conspiracy that had been under investigation for narcotics trafficking, with a California source, for approximately one year.
As the majority opinion recites, the disputed search of the Ford Explorer on September 20, 2010, transpired in parallel with the above described events in’ Greensboro. *840 Captain Roberts became suspicious while at a local truck stop when he came upon a commercial car carrier which, on the top rack of the trailer, was loaded with an “older model” Ford Explorer that was being transported from California to Greensboro, North Carolina. J.A. 35. This was the vehicle that Appellant and his associates had been awaiting in Greensboro, and which Appellant regularly inquired about at the Montlieu Avenue address in Greensboro beginning no later than September 24, 2010. Roberts examined the shipping documents for the Ford Explorer; Wilmer Casténada, Appellant’s alias, was listed as both the shipper and recipient. Regardless of whether Appellant (or some other member of the conspiracy) was the actual “shipper” — in the sense that he had been in California when the Ford Explorer had' been loaded onto the DAS trailer — he was, unmistakably, the recipient in Greensboro.
Roberts attempted to contact Appellant at'the phone number listed on the shipping documents, but there was no answer. Roberts then determined from an unspecified database that Appellant had no apparent connection to the California address. Roberts also determined (apparently using law enforcement or commercial databases not identified in the record) that two unidentified businesses could be associated with an address on Montlieu Avenue in Greensboro, North Carolina, where the Ford Explorer was to be delivered to “Wilmer Castenada.” But when he called those businesses, no one at either was familiar with the name “Wilmer Castena-da,” and no one to whom Roberts spoke could confirm the anticipated delivery of a Ford Explorer.[6] It was upon these facts— *841 and, apparently, these facts alone — that the district court erroneously concluded that Appellant had lacked a “legitimate expectation of privacy” at the point the Ford Explorer “had been given over to a common carrier with addresses which were ascertained to be false addresses.” J.A. 72.
Of course, as set forth above, and as the government well knew at the time of the suppression hearing (even though Roberts did not know it at the time he searched the vehicle on September 20, 2010), Roberts was seriously mistaken in his attempt to investigate the destination of the Explorer. As the government’s response to the motion to suppress made clear, “a business located in the Montlieu Avenue and Market Street area of Greensboro ... receive[d] shipped vehicles from DAS Auto Shippers,” and “a Hispanic man” had visited the business “several times since September 24, 2010,” asking about “a Ford Explorer.” J.A. 22-23.
Captain Roberts, having been stymied in his efforts to allay or confirm his suspicions regarding the Explorer, decided to roll the constitutional dice and worry about the consequences later.[7] That is, he proceeded to search the vehicle (1) without *842 probable cause to believe it contained, contraband or' evidence of a crime;[8] (2) without a warrant;[9] and (3) without the consent of any person with actual or apparent authority to consent to the search.[10] Upon searching the vehicle, he discovered the following evidence of consequence in this case: (1) the heavy odor of “Bondo,” which is “used for vehicle repairs” and “the construction of aftermarket compartments”; (2) evidence that the vehicle seats had been removed and the gas tank accessed; and, ultimately, using his fiber optic scope, (3) more than twenty bricks of cocaine, valued by Roberts at $3 million dollars, wrapped in plastic floating in the gas tank. J.A. 39-41, 47.
One week after Roberts had searched and seized the vehicle, on or about September 27, 2010, after putting in place a ruse with the assistance of DAS, the vehicle transport company, Roberts finally had contact with Appellant, calling from the number 336-263-7145[11] and identifying *843 himself by his alias, Wilmer Castenada.[12] In a phone conversation on that day, Roberts advised Appellant that he would have to arrange to retrieve the vehicle from Texas. Appellant agreed to do so and arrived in Texas sometime on or about October 1, 2010, when he and one of his coconspirators were arrested. Appellant was in possession of the title document to the Explorer and tracking- information from DAS, and a cell phone using the same number he had used to communicate with Roberts over the preceding several days.[13]
Meanwhile, back in Greensboro, Agent Razik had successfully uncovered the story of the undelivered Ford Explorer, when he returned to the towing business on Mont-lieu Avenue in Greensboro and learned that Appellant had been the man inquiring about the Ford Explorer, between September 24 and September 29, 2010. J.A. 23-24. In fact, according to Roberts’s hearing testimony, Agent Razik had telephoned Roberts on or about September 28, 2010, and the two conferred regarding what was now their joint investigation of the North Carolina-based drug conspiracy:
On the 28th, I believe it was, of September, I spoke with Agent Razik.... He was aware of the Ford Explorer. Matter of fact, he was waiting for the Ford Explorer to arrive in North Carolina. The vehicle never showed up. Through his investigation, he was able to come to the conclusion that it had been apprehended and seized in Texas and that’s where he got my name and phone number and contacted me.
Id. at 45-46. The government’s response to the motion to suppress further elaborated on the cooperation between the two law enforcement officers:
On September 28, 2010, Agent Razik spoke with Captain Kevin Roberts who confirmed that the vehicle had been *844 seized from the DAS car carrier after 23 kilograms of cocaine were found in the gas tank.. Captain Roberts advised Agent Razik that the vehicle’s bill of lading stated the vehicle was being shipped from Gardenia, California, to “Wilmer Castaneda” in Greensboro,
North Carolina. The telephone number listed for Castaneda on the Bill of Lading was 336-263-7145.
Id, at 23.
% • ;£ íjs ¡fc ;Ji
The sum and substance of the only rational version of the interstate narrative shown by this record, as of the time Roberts conducted his warrantless and non-consensual search of the Ford Explorer ón September 20, 2010, is that Appellant’s job as a coconspirator in the charged conspiracy was to exercise joint possession, dominion, and control over the Ford Explorer and see to its safe delivery to himself, in the person óf his alias, Wilmer Castenada, at 136 Montlieu Avenue, Greensboro, North Carolina.[14]
B.
On February 1, 2011, a federal grand jury in the Middle District of North Carolina indicted Castellanos and others for conspiracy to distribute five kilograms or more of a mixture or substance containing cocaine hydrochloride, in violation of 21 U.S.C. §§ 841 and 846. On April 1, 2011, he pled not guilty.
On June 3, 2011, Castellanos moved to suppress all evidence seized from the Ford Explorer, arguing that the search had violated the Fourth Amendment.[15] The government argued that Castellanos had no standing to challenge the search because he had lacked any “expectation of privacy in a vehicle that was being shipped under a fictitious name to the same fictitious person at an address in Greensboro, North *845 Carolina that [wa]s assigned to two local businesses.” J.A. 26. See also id. at 64.
On July 6, 2011, the district court denied the motion to suppress, reaching a bare legal conclusion, unsupported by any findings of fact, that Castellanos had lacked a reasonable expectation of privacy in a vehicle that “had been given over to a common carrier with addresses which weré ascertained to be false.” J.A. 72.[16] On July 18, 2011, Castellanos entered a conditional guilty plea, id. at 74, reserving his right to challenge the suppression ruling, see Plea Agreement 4, United States v. Castellanos, No. 1:11-cr-00031-NCT-5 (M.D.N.C. July 13, 2011), ECF No. 66. On December 2, 2011, he was sentenced to 120 months in prison. J.A. 5, 74-75. Judgment was entered on February 3, 2012, and Castellanos filed this timely appeal on February 13, 2012. Id. at 5, 74.
II.
Castellanos argues that the district court erred in denying his motion to suppress the evidence from the Ford Explorer because the government did not obtain a warrant and no “well-defined exception existed to justify the search.” Appellant’s Br. 13. He contends that “[pjlacing an item into the hands of a shipper ... does not ... diminish one’s expectation of privacy in that item.” Id. at 9.
The government counters that Castella-nos had no legitimate expectation of privacy because, at the time of the search, “no facts ... connected [him to] the Ford Explorer”: “The information provided to the car carrier service was totally false,” and any “subjective expectation” that the drugs would not be discovered is “not one that society is prepared to recognize as reasonable.” Appellee’s Br. 13 (internal quotation marks omitted).
III.
A proper determination of standing requires careful consideration of all the evidence, regardless of which party, the government dr the defendant, introduces the evidence. Moreover, the evidence must be considered from a wholly objective perspective, without regard for the state of mind of the searching government agent. Finally, neither the use of an alias nor the transfer of possession of constitutionally *846 protected effects for transport by a common carrier vitiates an objectively reasonable expectation of privacy in connection with that property.
A.
“It is axiomatic that ‘suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by .the introduction of damaging evidence.’ ” United States v. Gray, 491 F.3d 138, 144 (4th Cir.2007) (emphasis in original) (quoting Alderman v. United States, 394 U.S. 165, 171-72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)). “Thus, the ‘capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection ... has a legitimate expectation of privacy, in the invaded place.’ ” Id. (ellipses in original) (quoting Minnesota v. Carter, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (quoting Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978))). “To be legitimate, an expectation of privacy must be objectively reasonable: it must flow from ‘a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.’” Id. at 145 (quoting Carter, 525 U.S. at 88, 119 S.Ct. 469).
Notably, the Fourth Amendment “does not shield only those who have title to the searched premises.” Mancusi v. DeForte, 392 U.S. 364, 367, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). Indeed, “[a] person may have a legitimate expectation of privacy in a place or object he does not own.” United States v. Perez, 689 F.2d 1336, 1338 (9th Cir.1982) (per curiam) (citing United States v. Reyes, 595 F.2d 275, 278 (5th Cir.1979)). “What is a reasonable expectation of privacy is by definition related to time, place and circumstance.” United States v. Ramapuram, 632 F.2d 1149, 1154 (4th Cir.1980). Thus, in determining whether a person has a reasonable expectation of privacy in a particular place or object, courts consider the totality of the circumstances, Gray, 491 F.3d at 151, taking into account “whether [the] person claims an ownership or possessory interest in the property,” United States v. Rusher, 966 F.2d 868, 875 (4th Cir.1992); the individual’s “control of the area searched,” United States v. Horowitz, 806 F.2d 1222, 1225 (4th Cir.1986); “his efforts to ensure [his] privacy” in the object or area, id.; “the purposes for which the individual uses the property,” United States v. Stevenson, 396 F.3d 538, 546 (4th Cir.2005); his “historical use of the property,” United States v. Sanchez, 943 F.2d 110, 113 (1st Cir.1991); and “society’s common understanding as to areas that deserve Fourth Amendment protection,” Stevenson, 396 F.3d at 546. “Any determination of the reasonableness of an individual’s expectation of privacy is necessarily fact intensive,” United States v. Smith, 978 F.2d 171, 180 (5th Cir.1992), and “custom and contemporary norms necessarily play ... a large role in the constitutional analysis,” Payton v. New York, 445 U.S. 573, 600, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).
The defendant bears the burden of proving standing to challenge a search under the Fourth Amendment. Stevenson, 396 F.3d at 547. Nonetheless, the defendant need not affirmatively present evidence of his legitimate expectation of privacy; rather, he may simply “point to specific evidence in the record which the government [has] presented and which established] his standing.” United States v. Zermeno, 66 F.3d 1058, 1062 (9th Cir.1995).[17] A mere *847 preponderance of the evidence will suffice. United States v. Vega, 221 F.3d 789, 795 (5th Cir.2000), abrogated on other grounds as recognized by United States v. Aguirre, 664 F.3d 606, 611 n. 13 (5th Cir.2011). Accord United States v. Helms, 703 F.2d 759, 763-64 (4th Cir.1983) (noting that “any ... fact at a suppression hearing” must be “established only by a preponderance of the evidence”).
B.
Because, as the majority recognizes, a reasonable expectation of privacy exists where the defendant- has a subjective expectation that is objectively reasonable, ante 832, Castellanos is the only person whose state of mind is relevant. Nonetheless, the majority focuses its attention on how the facts appeared to Captain Roberts at the time of the search. In so doing, the majority misapplies longstanding Fourth Amendment principles and reaches the wrong result.
Simply put, in a case like this, the “state of mind of the searcher regarding the possession or ownership of the item searched is irrelevant to the issue of standing.” United States v. Han, 74 F.3d 537, 545 (4th Cir.1996) (quoting United States v. Canada, 527 F.2d 1374, 1378 (9th Cir.1975)). See also United States v. Paradis, 351 F.3d 21, 32 (1st Cir.2003) (“[A] protec-tible [Fourth Amendment] interest ... does not depend on the state of mind of the police at the time, of the seizure.”). Rather, it is “the omniscient perspective— what a judge considering a motion to suppress knows, ex post reality — that drives standing doctrine.” 6 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 11.3 (5th ed.2012) (quoting Sherry F. Colb, Standing Room Only: Why Fourth Amendment Exclusion and Standing Can No Longer Logically Coexist, 28 Cardozo L.Rev. 1663, 1671 (2007)).
The results of Roberts’s inquiries about the Ford Explorer are relevant only insofar as they provide objective evidence of who had an “ownership or possessory interest” in the vehicle, Rusher, 966 F.2d at 875, or who had control of it, Horowitz, 806 F.2d at 1225. Such evidence is limited to Roberts’s, discovery, that the shipping documents identified the owner as Wilmer Castenada, and the officer’s subsequent discovery that Wilmer Castenada was Appellant’s alias. See supra• n. 12. That Roberts subjectively thought that the bill of lading listed a false address for delivery is irrelevant; as shown above, the government’s own filings indicated that a Mont-lieu Avenue towing business was expecting *848 delivery of the Ford Explorer. See supra n. 6. Indeed, Roberts himself testified that “Bobby’s Towing ... in Greensboro” was where the vehicle was “possibly destine[d].” Id. The officer further testified that Appellant had called the shipping company several times to inquire about the Ford Explorer, and had arrived in Texas— to retrieve the vehicle — with the title document to the Explorer, tracking information from DAS, and a cell phone using the same number he had used to communicate with Roberts over the preceding several days.
In sum, the objective evidence adduced at the suppression hearing demonstrated that' Wilmer Castenada was Appellant’s alias, Wilmer Castenada was listed on the bill of láding for the Ford Explorer, Appellant had the title and shipment tracking information for the vehicle, he had called several times to check’on the status of the Explorer, he had the cell phone from which he had made those calls, and a towing company in Greensboro had been expecting the vehicle’s delivery. The court also knew, from the government’s opposition to the motion to suppress, that Appellant had visited the Greensboro towing business several times to ask about the Ford Explorer. ■ These undisputed facts were more than sufficient to establish, by a preponderance of the evidence, that Appellant had an objectively reasonable protect-able Fourth Amendment interest in the Explorer and, in particular, in the privacy afforded by its gas tank.
c.
That Appellant used an alias does not defeat his objectively reasonable expectation of privacy. Although we have held that an individual who is not thé sender does not have a legitimate expectation of privacy in a mailing addressed to a third party,[18] the use of an alias alone does not foreclose the right to assert a Fourth Amendment claim. The distinction between the use of a third party as an addressee, and the use of an alias disguising the true identity of the addressee, cannot be overstated. An individual who is not the sender cannot assert an expectation of privacy in a mailing addressed to an actual third party because the privacy right, and thus any Fourth Amendment challenge, belongs to that third party. In contrast, where, as here, the individual asserting the expectation of privacy is in fact the addressee but has disguised his true identity by using an alias, he retains an expectation of privacy in the object, and the right to bring a Fourth Amendment challenge to the search or seizure of that object.
Despite the majority’s unwillingness to follow this principle, a number of courts have already done so. See United States v. Villarreal, 963 F.2d 770, 774 (5th Cir.1992) (holding that “individuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names”); United States v. Johnson, 584 F.3d 995, 1002 (10th Cir.2009) (“there is a fundamental difference between merely using an alias to receive a package and using another’s identity”); • United States *849 v. Colon-Solis, 508 F.Supp.2d 186 (D.P.R.2007) (“It is generally accepted that individuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names”) (citing United States v. Goldsmith, 432 F.Supp.2d 161, 170 (D.Mass.2006), and Villarreal, 963 F.2d at 774).
As the Seventh Circuit’s opinion in United States v. Pitts reminds us, “there is nothing inherently wrong with a desire to remain anonymous when sending or receiving a package.” 322 F.3d 449, 459 (7th Cir.2003). Although a “law enforcement officer or a court is certainly entitled to consider the use of an alias as a relevant factor in deciding whether to detain mail ... or issue a warrant,” the use of an alias alone should not result in a loss of Fourth Amendment rights. ' Id. at 459 n. 1. To hold otherwise significantly weakens Fourth Amendment protections, because the existence of a legitimate expectation of privacy “does not depend on the nature of the defendant’s activities, whether innocent or criminal.” Id. at 458 (citing United States v. Fields, 113 F.3d 313, 321 (2d Cir.1997)). Thus, Appellant’s use of the alias Wilmer Castenada did not defeat his legitimate expectation of privacy in the Ford Explorer.[19]
D.
Similarly, Appellant did not lose his privacy interest in the Explorer simply because an automobile transport service had physical possession of the vehicle. The mere fact of turning over an item — be it a letter, a package, or a vehicle — to a common carrier does not extinguish one’s objectively reasonable expectation of privacy in the item. It has long been held that letters and packages sent through the mail are accorded full Fourth Amendment protection. See United States v. Jacobsen, 466 U.S. 109, 114, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (“Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrant-less searches of such effects are presumptively unreasonable.”) (footnote omitted).
This Court has observed, “Sealed packages are, of course, entitled to Fourth Amendment protection against warrantless searches and seizures, just as any other private' area.” United States v. Givens, 733 F.2d 339, 341 (4th Cir.1984) (per cu-riam). The legitimate expectation of privacy in packages sent through the mail and common carriers extends to both senders and recipients. See id.; Villarreal, 963 F.2d at 774. Ordinarily, the sender’s expectation of privacy terminates upon delivery. United States v. King, 55 F.3d 1193, 1196 (6th Cir.1995).
There is no reason why a vehicle sent through a car delivery service would be entitled to any lesser expectation of privacy than, say, a package sent via the U.S. Postal Service. Just as there is no expectation of privacy in the address on a package, see United States v. Hinton, 222 F.3d 664, 675 (9th Cir.2000), one has no reasonable expectation of privacy in the exterior of a vehicle or respecting objects in a vehicle that are observed from outside it, see Texas v. Brown, 460 U.S. 730, 740, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); But, once placed within a closed container, “a *850 diary and a dishpan are equally protected by the Fourth Amendment.” Robbins v. California, 453 U.S. 420, 426, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981) (plurality opinion), abrogated on other grounds, California v. Acevedo, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).
It cannot seriously be argued that a vehicle gas tank is anything other than a closed container. Cf. United States v. Urbina, 431 F.3d 305, 310 (8th Cir.2005) (“The sound of objects moving in the tank gave the officers probable cause to believe that the gas tank contained contraband, and probable cause is sufficient to justify the warrantless search of an automobile or a container therein, including the destruction, if necessary, of the container.”). It therefore carries with it a reasonable expectation of privacy, protected by the Fourth Amendment, and cannot be searched absent a warrant or probable cause. As the recipient (if not the sender) of the vehicle, Appellant — using the alias Wilmer Castenada — had a reasonable expectation of privacy in the areas of the vehicle not observable by one looking into the interior of the vehicle from outside. See Robbins, 453 U.S. at 426, 101 S.Ct. 2841.[20]
E.
Considering the totality of the circumstances in this -case, Appellant had a reasonable expectation of privacy sufficient to maintain his Fourth Amendment challenge to the warrantless search of the Ford Explorer and its gas tank. Appellant used the alias Wilmer Castenada, Wilmer Castenada was listed on the bill of lading for the Ford Explorer, Appellant had the title and shipment tracking information for the vehicle, he called several times to check on the status of the Explorer, and he had the cell phone from which he had made those calls when he was arrested. Whether or not he was the actual owner, Appellant'had a right to possession, coupled with constructive dominion and control over the vehicle at the time Roberts searched it, such that, as a matter of law, he enjoyed an objectively reasonable expectation of privacy in the vehicle. The district court’s contrary finding and conclusion was clearly erroneous as a matter of fact and legally erroneous, as well.[21]
*851 IV.
For the reasons set forth herein, I would vacate the judgment, reverse the order of the district court ruling that Appellant lacked an objectively reasonable expectation of privacy in the Ford Explorer on September 20, 2010, and remand this case for further proceedings.

. The parties alternatively spell this name "Castenada” and "Castaneda.” To be consistent with the majority opinion, this dissenting opinion uses the spelling Castenada, except when used in a direct quote.

. No one doubts that Appellant sufficiently manifested a subjective expectation of privacy; the only issue presented on appeal, and the only issue discussed in this dissent, is the correctness of the district court's legal conclusion that Appellant lacked a "legitimate expectation of privacy at [the] point [when the Ford Explorer] had been given over to a common carrier with addresses which were ascertained to be false addresses.” See J.A. 72.

. By the same token, the district court and the majority commit legal error to the extent they fashion a new rule holding that delivering constitutionally protected personal effects to a common carrier is sufficient to undermine what is otherwise an objectively reasonable expectation of privacy. Although the Seventh Circuit has held, in the sole authority relied on by the district court in its summary denial of the motion to suppress here, that an individual relinquishes any privacy interest in a car when he turns it over to a shipper, United States v. Crowder, 588 F.3d 929, 934-35 (7th Cir.2009), the court’s reasoning in that case is deeply flawed and wholly unpersuasive. Not even the majority in this appeal accepts the Seventh Circuit’s dubious reasoning; the majority does not even bother mentioning Crowder. No wonder. As explained infra in Part III.D, the mere fact of turning over an item to a common carrier does not extinguish one’s objectively reasonable expectation of privacy in the item. If the majority intends, sub silentio, to fashion a contrary rule, then, in light of the irregular procedural course of events below,, we should, at a minimum, vacate the judgment and remand this case for further proceedings on the motion to suppress.

. This dissent’s consideration of undisputed facts in the record of this case, set out in the government’s written opposition to Appellant’s motion to suppress, see J.A. 15-24, but outside the formal testimonial record of the hearing on the motion to suppress, is fully consonant with circuit precedent. In United States v. Gray, over a vigorous dissent, this Court relied on evidence presented at sentencing to shore up its affirmance of the district court’s determination, made at the conclusion of an evidentiary hearing on a motion to suppress, that a defendant lacked an objectively reasonable expectation of privacy. 491 F.3d 138, 146-54 (4th Cir.2007). We reasoned as follows, in pertinent part:
This court has recognized that when later proceedings confirm the correctness of the district court’s findings, we can affirm a pre-trial suppression ruling based on such evidence. This ruling makes sense because all the facts pertinent to a suppression motion are not inevitably developed at a pretrial hearing and both the trial court and the appellate court should not be precluded from taking note of a more comprehensive record supporting, as it does here, the district court’s initial denial of the motion to suppress. ' In adopting a contrary approach, the dissent would create an artificial barrier against ascertainment of truth, lowering the curtain well before the end of the play.
Id. at 148 (citations omitted). It would make a mockery of the judiciary’s assertion that it is an impartial seeker of truth to make this rule a one-way street by applying it solely to evidence that confirms a district court’s denial of a motion to suppress, particularly on the threshold issue of standing.
Thus, this dissent relies on this Court’s ac-knowledgement that the search for truth is enhanced by consideration of “a more comprehensive record” supporting a district court's denial of a motion to suppress "because all the facts pertinent to a suppression motion are not inevitably developed at a pretrial hearing.” Id. Likewise, when "a more comprehensive record” is available to demonstrate that the denial of a pre-trial mling on standing was manifestly and clearly erroneous, the search for truth is enhanced when we examine that record. This precept is especially true where, as here, the district court made no independent findings and the facts relied on are vouched for by the government in its written opposition to a defendant’s motion to suppress and made a part of the joint appendix on appeal. See J.A. 15-29. See also United States v. Jordan, 635 F.3d 1181, 1185 (11th Cir.2011) (noting that, in reviewing "rulings on motions to suppress,” the appellate court is “not restricted to the evidence presented at the suppression hearing and instead consider[s] the whole record”).

5. The parties have alternatively spelled Appellant’s name "Arturo” and "Auturo.” This dissenting opinion employs the spelling used on the docket of this appeal: Arturo.

. Although the government did not elicit the address from Roberts during his testimony at the suppression hearing, the Montlieu Avenue address on the bill of lading (which itself is not in the record) was set forth in the government’s written response to the motion to suppress. J.A. 16. The address also appeared in the "Factual Basis in Support of Guilty Plea” filed in the district court about two weeks after the hearing on the motion to suppress. Factual Basis Document 2, United States v. Castellanos, No. 1:11-cr-00031-NCT-5 (M.D.N.C. July 18, 2011) (hereinafter "Factual Basis”). See supra n. 4 (discussing the propriety of considering supplementary material outside the formal testimonial record created at the hearing on the motion to suppress).
The address is 135 Montlieu Avenue, Greensboro, North Carolina, and two businesses share that address: Briclcwood Builders and Dove Communications. Factual Basis 2. These are the businesses that Roberts telephoned on September 20, 2010, immediately before he conducted the warrantless, nonconsensual search of the Ford, Explorer. Id. Of course, as he testified at the motion hearing on July 6, 2011, Roberts learned after speaking with Agent Razik on September 28, 2010, that, contrary to the address on the bill of lading, the correct address for the delivery of the Ford Explorer was just across the street from 135 Montlieu Avenue, to wjt, 136 Mont-lieu Avenue, near Market Street, where there is a towing company known as Bobby’s Friendly Towing. See J.A. 45 (Roberts’s testimony about his conversation with Agent Razik); id. at 55 (Roberts’s testimony that Castellanos, upon his arrest, had a piece of paper with information about “I believe a Bobby’s Towing here in Greensboro where the vehicle was possibly destine [sic] to”); Better Business Bureau, BBB Business Review of Bobby’s Friendly Towing & Storage, Inc., http://www. bbb.org^greensboro/businessreviews/towing-companies/bobbys-friendly-towing-and-storage-in-greensboronc-4004988 (last visited Apr. 16, 2013); GoogleMaps, http://maps. google.com (search “bobby’s friendly towing greensboro north Carolina” and zoom in five times) (last visited Apr. 16, 2013). Cf. United States v. Foster, 662 F.3d 291, 295 n. 6 (4th Cir.2011) (Agee, J.) ("We take judicial notice of a map of Lee County, Virginia.... ”).
I, for one, am disturbed that the government proceeded as it did. The government presented misleading testimony to the district court that likely had a grossly distorting effect on the hearing judge’s comprehension of the evidence bearing on whether, at the time Roberts conducted his warrantless, nonconsensual search of the Ford Explorer, Appellant had such an ownership interest in, or the right (as *841 a member of the narcotics conspiracy) to exercise such dominion and control over the Ford Explorer, as to sustain his objectively reasonable expectation of privacy against governmental intrusion.
If the judge had been told at the hearing that the bill of lading contained not a “false address” (as the judge ultimately found) but merely an erroneous address, off by one digit in the street number where the Explorer was to be delivered to Appellant, there is every reason to believe that the district court would have taken a closer look at the evidence and likely reached a contrary result than it did, given the alacrity with which the court reached its conclusion to deny the motion to suppress. Cf. United States v. Gamez-Orduno, 235 F.3d 453, 461 (9th Cir.2000) ("The suppression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.”) (affirming the district court’s finding that a Brady violation had occurred with respect to withheld evidence bearing on motion to suppress proceedings, i.e., the defendants’ 'Fourth Amendment standing, but further concluding that the district court had adequately cured the violation short of dismissal of charges); United States v. Foster, 874 F.2d 491, 495 (8th Cir.1988) (noting a "prosecutor’s.... overriding duty of candor to the court; and to seek justice rather than convictions").

. It is nothing short of remarkable that, at this late juncture in the ill-fated forty-year "War on Drugs,” before undertaking a risky warrantless search of the Ford Explorer, Captain Roberts failed to take the time to contact his colleagues in the law enforcement community in Greensboro, North Carolina, the destination of the suspicious vehicle. For decades, local, state, and federal agencies have demonstrated an admirable capacity for interjurisdictional cooperation. See, e.g., the seminal case of Illinois v. Gates, 462 U.S. 213, 225-26, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (describing how, in May 1978, in.the course of his investigation of an anonymous tip reporting drug trafficking activity, a narcotics detective in Bloomingdale, Illinois, obtained the assistance of federal DEA agents in Miami, Florida).f
The irony here is doubly striking inasmuch as it was Gates, in its rejection of the rigid test for probable cause determinations derived from Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), that established a “totality of the evidence” approach, and thereby rendered it far easier for law enforcement officers to obtain warrants, for which the Court has long expressed a strong preference. See Gates, 462 U.S. at 236, 103 S.Ct. 2317 ("Á magistrate's determination of probable cause should be paid great deference by reviewing courts.....A grudging or negative attitude by reviewing courts toward warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant....”) (internal quotation marks and citations omitted); see also Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("[Pjolice must, whenever practicable, obtain advance judicial approval of searches *842 and seizures through • the warrant procedure”). Captain Roberts’s dubious roll of the dice in conducting a warrantless search of the Ford Explorer in this case thus flies in the face of many decades of modern Supreme Court jurisprudence.

. The government has never argued that Roberts had probable cause to search the Ford Explorer.

. The government has never argued that a warrant was sought or obtained, and Roberts confirmed as much in his testimony. J.A. 63.

. Although- the government made fleeting references to consent, J.A. 26, 35, it provided no support to the district court for its contention that the driver of the automobile carrier had actual or apparent authority to consent to á search of the Ford Explorer. "[N]ot all bailment situations involve giving the bailee” such control over an object that the bailor " 'must be taken to have assumed the risk that [the bailee] would allow someone else to look inside.’ ” Wayne R. LaFave, 4 Search & Seizure: A Treatise on the Fourth Amendment § 8.6(a) (5th ed.2012) (quoting Frazier v. Cupp, 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969)). Notably, the record contains no evidence about the details of the bailment relationship in this case. In any event, the prosecutor’s argument at the suppression hearing reflected the government’s fundamental confusion over its role in this case:
Your Honor, first regarding the vehicle, the Government has argued in its response, the Defendant, based on this evidence, has no standing to contest the search of that Ford Explorer. The car that was being transported, the shipper is listed as Wilmer Castenada. The recipient is listed as Wilmer Castenada. No information on the title or who the owner is. The phone number on the bill of lading accompanying the vehicle, several calls that Captain Roberts made, he gets no answer. So the true owner of the vehicle is not identified, and the person who shipped it and to whom it was to be shipped, doesn’t live at either address.
When he spoke to people at the addresses here in Greensboro, they didn't know a Wilmer Castenada, so the vehicle is in possession of [the driver], so at that point, the Government would argue that [the driver] could lawfully give consent for the officer to look inside that vehicle.
J.A. at 64 — 65 (emphasis added). Thus, the government's consent argument was nonsensical: namely, if Appellant lacked standing, then the driver of the transport trailer could give valid consent. But what the government seems not to understand at all is that if Appellant lacked standing, neither consent nor any other substitute for a warrant was necessary because, without an objectively reasonable expectation of privacy, Appellant had no claim of right with respect to the vehicle whatsoever. See United States v. Davis, 690 F.3d 226, 241 (4th Cir.2012) ((''When there is no reasonable expectation of privacy, the Fourth Amendment is not implicated. A search or seizure for Fourth Amendment purposes does not occur, therefore, when a person lacks a reasonable expectation of privacy....”) (internal citations omitted), petition for cert. filed Jan. 29, 2013) (No. 12-8485).

.Interestingly, Roberts contradicted the government’s assertion in its opposition to the motion to suppress by testifying that this *843 phone number "wasn’t matching the phone number that [he] had off the bill of lading.” J.A. 43; id. at 23 (government's opposition to the motion to suppress, asserting that "[t]he telephone number listed for Castenada on the Bill of Lading was 336-263-7145”).

. See J.A. 43 (Roberts’s testimony that “Wilmer Castenada” had called him from 336-263-7145); id. at 50, 58 (Roberts’s testimony that 336-263-7145 "was the same number” from which "the subject identified as ... Wilmer Castenada” had called).
Roberts testified at the suppression hearing that Wilmer Castenada and Arturo Castella-nos were one and the same:
Q And you recognized [ (336)263-7145] as being the number that the individual was ... calling from when he was contacting you?
A. Yes. Identified as Mr. Wilmer Castena-da. That’s also the same number that I believe Mr. Moore with DAS Auto Shippers had given me.
Q. That he said belonged to Wilmer Caste-nada?
A. Yes.
Q. And that person you later determined to be Mr. Arturo Castellanos, correct?
A. Best I can figure, yes.
J.A. 61.

. Inexplicably, the government, and the majority following the government’s lead, devotes much attention to Appellant's activities in Texas and specifically his interactions with Captain Roberts after he had been arrested there. But few of those facts bear on the state of affairs at the time, one week earlier, when Roberts conducted the warrantless, nonconsensual search of the Ford Explorer. And the limited evidence having any relevance to the issue on appeal of Appellant's acts and statements in Texas cut against the government: (1) Appellant appeared with the title to the vehicle; (2) Appellant insisted (and never denied or disclaimed) he was the purchaser/owner of the vehicle; and (3) Appellant possessed the phone assigned to the number which Roberts had been using to communicate with Appellant. All of these facts were confirmed by Roberts in his hearing testimony. It wholly escapes me how this evidence cuts against a finding, rather than in support of a finding, that at the time of the search of the vehicle, Appellant harbored an *844 objectively reasonable expectation of privacy in the vehicle.

. The narrative set forth in this summary is fully described in the Factual Basis:
During debriefings, Juan Manuel Lopez advised DEA agents that defendant CAS-TELLANOS and Raul Hernandez were the two men he had ... instructed to meet in Greensboro on or about September 25, 2010, in order to take possession of a shipment of cocaine. According to Lopez, the cocaine was being shipped in a vehicle via car carrier from a source in California. The source told Lopez that CASTELLANOS and Hernandez would take possession of the load vehicle and deliver the cocaine to Lopez. Lopez stated he took defendant CASTELLANOS to obtain a fictitious identification card. Lopez recalled that the last name on the ID card was Castaneda. Lopez advised that defendant CASTELLANOS went to a carrier business near Market Street and Montlieu Avenue in Greensboro several times between September 25 and September 29, 2010, in order to find out when the vehicle would be delivered. On ■ September 29, 2010, CASTELLANOS was advised by a person at the Greensboro car carrier company that the vehicle was in Pecos, Texas. CASTELLANOS advised Lopez that he and Hernandez would travel to Pecos in order to retrieve the vehicle. Lopez stated that he advised CASTELLANOS not to make the trip and to take a loss on the vehicle and the load. CASTELLANOS decided to make the trip and Lopez gave CASTELLANOS and Hernandez $1,000 in cash in order to purchase airline tickets to Texas. Lopez dropped the pair off at the Raleigh-Durham airport. Lopez stated that he spoke with the California source on October 2, 2010. The source advised Lopez that the defendant and Hernandez had robbed the drug trafficking organization. During a subsequent call, the source advised Lopez that something was not right [with the shipment] and directed Lopez to get rid of the contact number Lopez had for defendant CASTELLANOS.
Factual Basis 10-12. The parties confirmed this account, as well, at the sentencing hearing. See Sentencing Tr. 23-25, United States v. Castellanos, No. 1:11-cr-00031-NCT-5 (M.D.N.C. Apr. 12, 2012), ECFNo. 98.

. J.A. 10-13. Castellanos also moved to suppress the evidence seized from the duffel *845 bag he took with him to Texas, id.., but has abandoned that claim on appeal.

. Curiously, although the government’s written opposition to the motion to suppress relied solely on Appellant’s alleged lack of standing, the transcript of the motion hearing shows that neither the government nor the district court actually called on Appellant to "prove” his standing. Specifically, this is how the motion hearing commenced:
THE COURT: Ms. Hairston.
MS. HAIRSTON: Good morning. Your Honor, we’re calling United States of America versus Arturo Castellanos, case number l:llCR31-5. Mr. Castellanos is represented by Mr. Michael Archenbronn. The case is called for hearing on the Defendant’s motion to suppress.
THE COURT: Do we need an interpreter in this case?
MR. ARCHENBRONN: No, Your Honor.
THE COURT: ' Mr. Castellanos, would you — is Castellanos the name you prefer to be addressed by?
THE DEFENDANT: Yes, sir. That’s fine with me.
THE COURT: You may be seated. Ms. Hairston, do you have evidence?
MS. HAIRSTON: Yes, sir, Your Honor. We would like to call at this time, Captain Kevin Roberts.
(CAPTAIN KEVIN ROBERTS, GOVERNMENT’S WITNESS, WAS SWORN.)
Thus, the government proceeded to introduce evidence even before it was satisfied it had to do so, because if Appellant lacked standing, there was no need for the government to introduce any evidence at all. See Illinois v. Andreas, 463 U.S. 765, 771, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) ("If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no ‘search’.... ”).

. Accord United States v. Gales, 745 F.Supp.2d 936, 948 n. 4 (N.D.Cal.2010) ("[A] *847 defendant may establish standing by pointing to all evidence in the record, including the Government's evidence.”); United States v. Doe, 801 F.Supp. 1562, 1573 (E.D.Tex.1992) (finding that defendant established a legitimate expectation of privacy in a car through "testimony by a government witness from which it [wa]s reasonable to infer that defendant's possession of the vehicle was lawful and with permission”); 6 Wayne R. LaFave, Search dr Seizure: A Treatise on the Fourth Amendment § 11.2(b) (5th ed. 2012) ("[I]t may happen that the burden is actually met ... by evidence given by the [government].”), citing People v. Gonzalez, 68 N.Y.2d 950, 510 N.Y.S.2d 86, 502 N.E.2d 1001, 1002 (1986) ("[E]vidence elicited during the People's direct case may be cited in support of a defendant's standing claim.”) (internal citation omitted); 1 John Wesley Hall, Jr., Search dr Seizure § 6.3 (Lexis-Nexis 2012) ("It is conceivable that the defense could show [standing] through prosecution witnesses and that it could be self-evident in many circumstances.”), citing People v. Fuentes-Borda, 186 A.D.2d 405, 589 N.Y.S.2d 5, 6 (1992) (holding that defendant had standing to challenge police invasion of apartment because, although defendant had not asserted "personal standing,” “the police observations of defendant and his companion entering, exiting and locking the apartment established a privacy interest sufficient to confer standing”).

. See United States v. Givens; 733 F.2d 339, 341-42 (4th Cir.1984) (per curiam) (finding defendants lacked a legitimate expectation of privacy in the contents of a package addressed "neither to them nor to some entity, real or fictitious, which is their alter ego, but to actual third parties,” and specifically reserving opinion on whether a legitimate expectation of privacy can exist in a package addressed to a fictitious entity created by the defendants). See also United States v. Smith, 39 F.3d 1143, 1145 (11th Cir.1994) (holding a defendant lacked a legitimate expectation of privacy in a letter addressed to, and opened by, a third party); United States v. Koenig, 856 F.2d 843, 846 (7th Cir.1988) (finding a defendant who was "neither the sender nor the addressee of the package” had no privacy right in it, and thus lacked standing).

. The majority’s observation that Appellant "maintained that Castenada was a different person” is of little import. Ante p. 831. Appellant made such assertions only after he had been arrested on October 1, 2010, and long after his objectively reasonable expectation of privacy in the Explorer had been subjected to a governmental intrusion on September 20, 2010; ' ”[I]t is difficult to understand how a refusal to make incriminating admissions in response to police interrogation can be held to deprive a person of Fourth Amendment standing.” 6 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 11.3(e) (5th ed.2012).

. Contrary to the majority’s subliminal suggestions, which appear throughout its analysis, nothing in the record supports the view that the Ford Explorer had been abandoned at the time Roberts searched it on September 20, 2010. As noted earlier, see supra n. 6, the bill of lading listed a Montlieu Avenue address as the vehicle’s destination, and a towing company on that street was expecting its delivery, for further delivery to Appellant. Indeed, Roberts testified to this at the suppression hearing. Id. At worst, then, the bill of lading contained a typo in the delivery address, not a "false” address.
Inexplicably, despite the abundant undisputed evidence in the record, which includes a photo identification made by an employee of the Montlieu Avenue towing company where the drug-laden Ford was to be delivered, that it was indeed Appellant who repeatedly appeared (as "Wilmer”) between September 24 and 26, 2010, to take delivery of the vehicle, the majority (purporting to "grant[ ] Castella-nos the benefit of the doubt,” ante at 835) seems to reject that undisputed fact. It is not clear to me how an appellate court can question or ignore such undisputed material facts in the record, facts to which the parties have stipulated in support of a guilty plea.

. The majority's assertion that "the argument made by the dissent appears sua sponte for the first [time] in the dissent, having never been presented by Castellanos, in the trial court or on appeal,” ante at n. 4, is downright puzzling. As previously mentioned, the sole basis for the district court’s denial of the motion to suppress was its reliance on United States v. Crowder, 588 F.3d 929, 934-35 (7th Cir.2009), for the proposition that Appellant lacked a "legitimate expectation of privacy at [the] point [when the Ford Explorer] had been given over to a common carrier with addresses which were ascertained to be false *851 addresses.” See J.A. 72; see supra n. 3. In his brief on appeal, Appellant took direct aim at that legal conclusion, identifying the issue on appeal as follows;
DID THE DISTRICT COURT COMMIT ERROR BY DENYING APPELLANT! ]’S MOTION TO SUPPRESS THE EVIDENCE FOUND IN THE FORD EXPLORER WHEN IT HELD THAT APPELLANT HAD NO LEGITIMATE EXPECTATION OF PRIVACY IN THE FORD EXPLORER SINCE IT WAS BEING SHIPPED BY A COMMON CARRIER?
Appellant's Br. 2. Thus, it is the majority, not Appellant or this dissent, that has fundamentally altered the legal landscape on which the case has been litigated in the course of this appeal. In any event, as Justice Marshall instructed the courts of appeals twenty-five years ago:
When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.
Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). Cf. Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1346 (Fed.Cir.2001) (noting “the familiar principle that [an appellate court] does not review supporting arguments, but only the decisions reached by the trial court”); Lawlor v. Nat’l Screen Serv. Corp., 352 U.S. 992, 994, 77 S.Ct. 526, 1 L.Ed.2d 540 (1957) (per curiam) (Frankfurter, J., dissenting) (“We review judgments not talk.”).